

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-25-1997

# Stewart v. Rutgers

Precedential or Non-Precedential:

Docket 96-5354

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Stewart v. Rutgers" (1997). *1997 Decisions*. Paper 171.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/171

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 25, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5354

JANICE P. STEWART,

Appellant,

v.

RUTGERS, THE STATE UNIVERSITY; JOSEPH J.
SENECA, Chair, Promotion and Review Committee;
FRANCIS L. LAWRENCE, President, Rutgers University

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 95-cv-04373)

ARGUED JANUARY 22, 1997

BEFORE: NYGAARD and LEWIS, Circuit Judges
and SCHWARZER,* District Judge.

(Filed July 25, 1997)

_____

* Honorable William W Schwarzer, United States District Judge for the
Northern District of California, sitting by designation.

Michael H. Sussman (ARGUED)
Law Offices of Michael H. Sussman
25 Main Street
Goshen, NY 10924

 Attorney for Appellant

Irving L. Hurwitz (ARGUED)
Carpenter, Bennett & Morrissey
100 Mulberry Street
Three Gateway Center
Newark, NJ 07102

 Attorney for Appellees

**OPINION OF THE COURT**

LEWIS, Circuit Judge.

Janice P. Stewart appeals from the district court's grant of summary judgment in favor of Rutgers, the State University of New Jersey; Joseph J. Seneca, chair of its Promotion and Review Committee ("PRC"); and Francis L. Lawrence, president of Rutgers (collectively "Rutgers") on her racial discrimination claim initiated pursuant to 42 U.S.C. § 1981(c), and her Equal Protection claim brought pursuant to 42 U.S.C. § 1983. She argues that the record contains evidence from which a jury could conclude: (1) that the rejection of her 1994-95 tenure bid was motivated by racial discrimination; and (2) that Rutgers' proffered legitimate nondiscriminatory reasons for not granting tenure to her are not worthy of credence.

For the reasons that follow, we will reverse the district court's grant of summary judgment as to both of Stewart's claims.

I.

Dr. Janice P. Stewart, who is black, was an Assistant Professor in the Department of Learning and Teaching at the Graduate School of Education at Rutgers University,

New Brunswick campus. From the 1990-1991 academic year to the 1994-1995 academic year, Rutgers considered 368 faculty members for tenure, of whom 238 were granted tenure, a success rate of sixty-five percent. During Stewart's employment at Rutgers, no black person was ever granted tenure in her department. Joint Appendix ("JA") at 695. The only black person to be granted tenure in the Department of Learning and Teaching was a professor who was hired from another university with tenure. Id. Except for that person, there has not been a tenured black member of the department for over twenty years. JA at 797.

Rutgers makes tenure decisions by considering the teaching, service and scholarship of the tenure applicant. Several factors are considered when evaluating scholarship: peer evaluations, research, presentation of papers, fellowship and grant awards and publication of books and articles. No single factor is dispositive.

Rutgers' procedure for considering applicants for the position of Associate Professor with tenure, described in the 1994-95 "Academic Reappointment/Promotion Instructions,"[1] requires that an applicant prepare a description of his or her qualifications, including scholarly accomplishments. This information is compiled on "Form a-1." Form a-1 and supplementary materials consisting of confidential letters of recommendation and other evaluation forms comprise the applicant's "Promotion Packet."

The Promotion Packet is first evaluated by tenured members of the candidate's department. The department produces an evaluation which reflects majority and minority views on the substance of the candidate's application. JA at 66. The Promotion Packet is also evaluated by the Appointments and Promotions Committee ("A & P Committee"), which is composed of faculty members of the candidate's institution. The department's and the A & P Committee's evaluations are then considered by the dean, who makes an independent recommendation.

---

1. Stewart applied for tenure during both the 1992-93 academic year and the 1994-95 academic year. The 1992-93 instructions are essentially the same as the 1994-95 instructions.

The next review is performed by the PRC. The PRC is charged with making promotion recommendations to the president of Rutgers. The PRC's purpose is to guard the integrity of the tenure review process by ensuring that evaluations of candidates have been made by leaders in their academic fields and that "appropriate evidence and analysis have been presented of accomplishment and impact on the field to support these judgments." JA at 67. After the PRC makes such an assessment, it then makes a recommendation to the president of the university. After review of all materials relating to the applicant, the university's president makes a recommendation to the Board of Governors, which makes the final decision to grant or deny tenure. Each candidate for tenure is reviewed independently by the PRC, without respect to the credentials of other candidates.

Stewart first applied for tenure during the 1992–1993 academic year and was unsuccessful. Stewart's Promotion Packet contained evaluations from nine referees, who were faculty members at other universities. The referees were asked to assess Stewart's scholarship, evaluating the "originality and quality of [her] achievements, their impact upon the field and the value of [her] contributions to the profession," and her accomplishments "relative to others in comparable positions in the discipline nationally and internationally." JA at 246. The referees' responses were varied.

The Department of Learning and Teaching recommended Stewart for promotion to Associate Professor with tenure by a vote of eleven to one. However, the department observed that Stewart had not fully demonstrated peer acceptance and recognition of her work because she had failed to publish in refereed journals. The department also noted that most of Stewart's work was collaborative, and that only recently did she develop an independent line of research.

The A & P Committee recommended against promotion and tenure by a two to one vote. JA at 345–46. Specifically, the Committee stated that Stewart was a not a strong candidate, but demonstrated potential for being a productive, nationally visible scholar. Id. at 345. After considering the recommendations from the department and

4

the A & P Committee, acting Dean Nobuo Shimahara recommended granting tenure. Id. at 349. The dean's decision was based on seven of the nine peer reviews which commended Stewart's scholarship. Id. at 347. The dean noted that although many of Stewart's works were collaborative and that she had only one publication in a refereed journal, he viewed her work as "definitely substantial and meritorious" and "broadly recognized." Id. at 348.

In contrast, the PRC recommended that Stewart be denied tenure. Id. at 350. It noted that reviewers of Stewart's work found a lack of substantive contribution in scholarship and that the independence and quality had been questioned. Id. The PRC concluded that based on the record, Stewart "had not achieved a level of scholarly accomplishment to justify promotion to the level of Associate Professor with tenure." Id. President Lawrence concurred with the PRC's recommendation and so informed the Board. The Board thereafter denied tenure. Stewart was informed of the Board's decision by letter dated April 2, 1993.

Stewart filed a grievance concerning the decision to deny tenure. She claimed that the PRC's conclusion contained material factual errors. Stewart alleged that the decision was arbitrary and capricious and that procedural violations occurred. She also alleged racial and gender discrimination.

The grievance committee found that the PRC's report contained material factual inconsistencies and that the PRC's decision had been made arbitrarily and capriciously. It remanded Stewart's application for full re-evaluation with an opportunity for Stewart to update relevant information. Id. at 109. The committee found that the PRC's report was not fully accurate on three points: (1) it failed to mention that six of the nine peer reviews stated that Stewart's work was more than merely promising, (2) it failed to reflect that six of the peers were highly positive of Stewart's written work and (3) the peer reviewers did not question the independence or quality of Stewart's work. The committee then concluded that Stewart's 1992-1993 rejection "could not have been reached by reasonable evaluators." However, the committee found no pattern of race or gender

5

discrimination. Id. at 109, 113. Though the committee found no pattern of discrimination, it noted that:

[t]here was no apparent pattern of racial or sexual discrimination, but serious deficiencies in the areas of supervision, advice, mentoring, and assignment of duties were apparent . . . The obvious and traditional University concern with providing special support for minority faculty was not evident in materials presented at the hearing for this candidate. The [Graduate School of Education] did not seem to carry out expectations of affirmative action . . . [Stewart's allegations of racial discrimination] were not proven in the technical sense, but the [Promotion Review Committee] should be apprised of the setting for this candidate's probationary years at Rutgers in the context of the University's commitment to affirmative action.

JA at 112.2

Stewart applied for tenure again during the 1994–1995

---

2. The grievance committee's conclusion that there was no racial discrimination relating to the denial of Stewart's tenure bid is not definitive. The grievance committee explicitly concluded that although there was no "apparent" racial discrimination in the "technical sense," there was sufficient evidence to illustrate that the Promotion Review Committee did not conduct its review of Stewart's bid for tenure consistent with the University's affirmative action policy, as noted above. Further, the grievance committee's finding that there was no pattern of racial discrimination was limited to the specific allegation made by Stewart that the conduct of the Department of Teaching and Learning and its Chairperson, not the Promotion Review Committee, demonstrated a pattern of discrimination against her. Finally, the record indicates that in reviewing Stewart's 1994-95 bid for tenure, the grievance committee was not permitted to consider or evaluate the promotion packets of other individuals in assessing her discrimination claims. Assuming that the grievance committee was similarly restricted in 1994, it is obvious that the committee could not consider factors critical to Stewart's showing of pretext, and thus critical to her claim in this litigation. In sum, the circumstances indicate that the grievance committee's finding of no discrimination does not end the inquiry, as the specific claims and theories alleged by Stewart could not have been fully addressed by the grievance committee, to the extent that they were presented to the committee for review.

6

year. In this evaluation, individuals outside Rutgers again submitted peer review recommendations. The peer review comments were generally positive. Some stated that Stewart likely would be granted tenure at their respective institutions. In general the comments commended Stewart's contributions and position of authority in the field. One review was less favorable. It expressed the view that Stewart's productivity was weak because she had published three articles as first author in mediocre journals which are not research-oriented. JA at 433.

The department unanimously recommended Stewart for promotion. Id. at 446. Faculty members rated Stewart's scholarship from outstanding to average, with seven of ten rating her "above average." Id. at 445. The department's report stated that referees were extremely positive but noted areas of concern. Id. at 444.

The A & P Committee assessed Stewart's scholarship as somewhat limited, but passable. It also noted that Stewart "ha[d] accumulated a strong and improving record of research, teaching and service to minority groups and, therefore, in addition to her other accomplishments, ha[d] advanced the purposes of the University's Affirmative Action program." JA at 455. Louise Cherry Wilkinson, dean of the Graduate School of Education, recommended Stewart for promotion. She viewed Stewart's scholarship as above average, and her work in the field as above average and well regarded. She further found that the quality and impact of Stewart's research was high, but that the quantity was not above the norm. JA at 450-51.

The PRC stated that because Stewart had not established a record of substantial, independent productivity, she had not demonstrated the requisite level of scholarship to justify promotion with tenure. Id. at 351. The PRC also determined that Stewart's work lacked significant, external peer-reviewed support and did not demonstrate substantial national impact. Id.

Again, the president and the Board denied promotion with tenure. JA at 115. Stewart was informed by letter on June 13, 1995. Id. Stewart filed another grievance claiming factual errors by the PRC, arbitrary and capricious

7

decision-making and racial discrimination. The grievance was denied in its entirety.

Two professors in Stewart's department were granted tenure in the 1994-1995 academic year, Drs. Kelly and Smith. The peer reviews which were part of these professors' Promotion Packets featured evaluations which were generally more laudatory than Stewart's. JA at 499, 524, 599, 629. Furthermore, these professors had received greater grant support than Stewart. Drs. Kelly and Smith obtained $623,653.00 and $18,039, respectively. Id. at 485, 586. Stewart obtained $13,500.00. Id. at 282-83.

On May 10, 1996, the district court entered summary judgment in favor of the defendants. With respect to the March 1993 denial of tenure, the district court found that Stewart's claims under 42 U.S.C. §§ 1981(c) and 1983 were time barred, a ruling not contested on appeal. With respect to the tenure rejection of May 1995, the district court determined that no issues of material fact existed regarding Stewart's claim that her tenure denial in 1994-95 was motivated by racial discrimination. This appeal followed.

Our review of a district court's grant of summary judgment is plenary, and we are required to apply the same test the district court should have utilized initially. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987) (en banc). The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

II.

A.

The question before us is whether there is sufficient evidence to create a genuine issue as to whether the employer intentionally discriminated. Weldon v. Draft, 896 F.2d 793, 797 (3d Cir. 1990). In order for Rutgers to succeed on a motion for summary judgment, it must show that Stewart "will be unable to introduce either direct evidence of a purpose to discriminate or indirect evidence by showing that the proffered reason [for her tenure denial] is subject to factual dispute." Id.

8

We are required to examine the evidence of record in the light most favorable to Stewart, as the party opposing summary judgment, and resolve all reasonable inferences in her favor. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." <u>Robinson v. PPG Indus. Inc.</u>, 23 F.3d 1159, 1162 (7th Cir. 1994).

B.

At issue is whether Stewart has satisfied her burden under the <u>McDonnell Douglas-Burdine</u> framework to show that racial discrimination motivated her tenure denial, or that Rutgers' nondiscriminatory reason for such denial is unworthy of credence. <u>See Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981); <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Our application of the <u>McDonnell Douglas-Burdine</u> framework is applicable to Stewart's allegation of racial discrimination under 42 U.S.C. §§ 1981[3] and 1983.[4] <u>See St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 n.1 (1993) (assuming applicability of <u>McDonnell Douglas-Burdine</u> framework to 42 U.S.C. § 1983);

_____

3. 42 U.S.C. § 1981 mandates that:

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a). This section further instructs that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

4. 42 U.S.C. § 1983 provides in relevant part:

"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured . . . ."

9

Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (applying framework to claims under 42 U.S.C. § 1981).

Under McDonnell Douglas, Stewart must first establish a prima facie case by a preponderance of the evidence. St. Mary's Honor Ctr., 509 U.S. at 506 (citing Burdine, 450 U.S. at 252-53). In Bennun v. Rutgers State University, 941 F.2d 154 (3d Cir. 1991), which also involved a rejected bid for tenure at Rutgers, we explained that the plaintiff must demonstrate by a preponderance of the evidence that she is within a protected class, that she applied for, was qualified for and was rejected for the position she sought and that nonmembers of the protected class were treated more favorably. Id. at 170. Here, the parties do not dispute that Stewart did just that.

After an employee has established a prima facie case, this creates a presumption of discriminatory intent by the defendant-employer. Burdine, 450 U.S. at 254. The burden then shifts to the defendant to produce evidence that the adverse employment action was taken "for a legitimate, nondiscriminatory reason." Id. "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff 's rejection," id. at 255, which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action. Hicks, 509 U.S. at 507. If the defendant's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case. Burdine, 450 U.S. at 260 (noting that "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions"); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992). The burden then falls upon the plaintiff to prove that the "employer's proffered reason [for the employment action] was not the true reason for the . . . decision" but was instead pretextual. Hicks, 509 U.S. at 508.

In Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1990), we explained that in order to make the requisite showing of pretext,

the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual

10

dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the . .. plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them `unworthy of credence,' and hence infer `that the employer did not act for [the asserted] nondiscriminatory reasons.'

Id. at 765.

In order for a plaintiff to survive summary judgment at this stage, she must present sufficient evidence to raise a genuine issue of fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action. Fuentes, 32 F.3d at 764 ("[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."); Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc). The crux of the district court's decision was that Stewart failed to make such a showing.

C.

Stewart may avoid summary judgment by establishing that a reasonable factfinder could conclude that invidious discrimination more likely than not motivated the adverse action. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3d Cir. 1995). In reaching the conclusion that Stewart could not make such a showing, the district court declined to consider a significant piece of circumstantial evidence offered by Stewart: the grievance committee's conclusion that the denial of tenure to Stewart in 1992-93 was "arbitrary and capricious." In doing so, the district

11

court failed to give Stewart the benefit of all reasonable inferences.

Stewart points to the grievance committee's findings regarding her 1992–1993 tenure rejection. The grievance procedure is provided by the American Association of University Professors, with whom Rutgers has an agreement, with the purpose of "ensur[ing] the integrity of the reappointment, promotion, and tenure procedures; to provide a process for determining whether evaluations resulting in negative personnel actions were flawed . . . and to provide remedies in cases where defects are found." While the district court was correct in finding that any discrimination claim based on Stewart's 1992–93 tenure denial is time-barred, we reject the notion that the events surrounding that denial are not relevant evidence which Stewart could use at trial. See United Air Lines v. Evans, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.").

The grievance committee found that the PRC's decision to deny Stewart's promotion to associate professor was "arbitrary and capricious" and "could not have been reached by reasonable evaluators." JA at 109. It noted various inconsistencies and procedural errors. For example, in reviewing the PRC's conclusion that Stewart's substantive contribution to scholarship was inadequate the committee noted that the PRC's characterization of her work as merely "promising" failed to "reflect the fact that six of the nine outside letters, including letters written by nationally recognized leaders in the field, spoke of Professor Stewart's work as considerably more than simply `promising.' " Id. at 114. The grievance committee also criticized the PRC's finding that "some" evaluators questioned the independence and quality of Stewart's work. Id. The committee stated that "[w]hile it is true that some evaluators from Rutgers did make this judgment, we found

12

no evidence of this opinion regarding the independence or quality of Stewart's work in any of the nine letters written by outside reviewers." Id. Due to these factual and procedural inconsistencies and, according to the grievance committee, "arbitrary and capricious conduct on the part of the PRC," the committee ordered that Stewart's tenure bid be reevaluated.

In our view, this is sufficient evidence upon which a jury could conclude that Stewart's 1994-95 tenure denial may have stemmed from discrimination based on race. See Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 267-68 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures, too, may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.").

We conclude that the grievance committee's finding that Stewart's 1992-93 rejected tenure bid "could not have been reached by reasonable evaluators" is sufficient to defeat Rutgers' motion for summary judgment since it presents a genuine material issue as to whether the tenure denial was a product of discrimination. Accordingly, we find that summary judgment was improper.5

_____

5. Stewart also alleged that Rutgers' proffered nondiscriminatory reason for nonpromotion was "unworthy of credence." The district court, in its opinion, styled Rutgers' non-discriminatory justification for denying Stewart tenure as: (1) Drs. Smith and Kelly published more material in journals considered as "top-tier," (2) Smith and Kelly had been awarded more funds than Stewart, and (3) the defendants' evaluation of Stewart was properly based on subjective qualitative evaluations of her work, which the defendants found inadequate to justify promotion. JA at 41.

Stewart contends that the district court ignored significant evidence of pretext. Stewart relates that the PRC relied extensively on the outside evaluators to assess her scholarship. This is significant, Stewart contends, because no committee member had direct or relevant experience in Stewart's area of expertise. Stewart also argues that her negative references were highlighted while the negative reviews of Drs. Kelly and Smith were not. Finally Stewart contends that the difference in

13

III.

For the reasons stated above, we reverse the district court's order and remand for trial.

A True Copy:
Teste:

_____

the amount of grant money she obtained in relation to Smith was too
minute to be reasonably relied upon by Rutgers as a reason for
nonpromotion.

Because we conclude that the district court's grant of summary
judgment was improper, in light of its failure to consider the grievance
committee's finding of arbitrariness as probative evidence of racial
animus, we need not reach Stewart's contention that Rutgers' proffered
reasons    for    her    tenure    denial    are    "unworthy    of    credence."