

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2005

# EEOC v. Muhlenberg College

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2788

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"EEOC v. Muhlenberg College" (2005). *2005 Decisions.* Paper 1174.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1174

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No:  04-2788

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Appellant

v.

MUHLENBERG COLLEGE

—————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No.: 02-CV-07430
District Judge: The Honorable Franklin S. Van Antwerpen

—————————————

Argued March 30, 2005

Before: ALITO, SMITH and ROSENN, *Circuit Judges*

(Filed: May 17, 2005)

Eric S. Dreiband
Vincent J. Blackwood
Lorraine C. Davir
Daniel T. Vail (Argued)
Equal Employment Opportunity Commission
1801 L. Street, N.W., 7th Floor
Washington, D.C. 20507
        *Counsel for Appellant*

Nancy Conrad (Argued)
White & Williams
3500 Winchester Road

Suite 200, The Frederick Building
Allentown, PA 18104

*Counsel for Appellee*

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

The Equal Employment Opportunity Commission ("EEOC") filed a complaint in the United States District Court of the Eastern District of Pennsylvania against Muhlenberg College ("Muhlenberg") alleging a Title VII national origin claim on behalf of Dr. Da'an Pan based on Muhlenberg's denial of Dr. Pan's tenure application. The District Court granted Muhlenberg's motion for summary judgment. The EEOC filed a timely appeal.[1] We will affirm.

Dr. Pan, a native of China, obtained a Masters Degree in English Literature from Hangzhou University in China, and taught for several years thereafter in his native country. In 1991, after earning a Ph.D. in Comparative Literature from the University of Rochester, Dr. Pan was employed as an assistant professor in Comparative Literature and East Asian Language and Cultures at the University of Illinois. In 1996, Dr. Pan

---

[1]The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331. Appellate jurisdiction exists under 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment and apply the same standard that the District Court is required to employ. *Abramson v. William Patterson College*, 260 F.3d 265, 276 (3d Cir. 2001).

2

responded to Muhlenberg's search for a Professor of Traditional Chinese Civilization. Muhlenberg's President, Arthur Taylor, offered Dr. Pan an appointment as an Assistant Professor of Chinese Civilization, with the hope that Dr. Pan would develop a program in Asian and/or Asian and Western Comparative Studies. Dr. Pan's primary affiliation was with the Philosophy Department, but half of his teaching load was comprised of courses in other departments.

During the spring of 1998, near the end of Dr. Pan's second year, Muhlenberg invited Dr. Pan to a meeting for all tenure candidates to review the requirements for tenure as set forth in its Faculty Handbook. The Handbook provided that the initial consideration of a tenure application was performed by a Faculty Evaluation Committee on Tenure and Promotions ("FEC"), which evaluated the candidate's record and recommended either a grant or denial of tenure. The FEC's report and recommendation was submitted to the Dean of the College Faculty, Curtis Dretsch, and then forwarded to President Taylor. "Tenure is granted only by action of the Board of Trustees upon the recommendation of the President and Board of Trustees' Educational Policies and Faculty Affairs Committee." The Faculty Handbook specified that "excellence in teaching is foremost among the criteria used to evaluate members of the Faculty."

Dr. Pan applied for tenure in the fall of 1998, submitting various documents to the FEC for its consideration. These included evaluations by Muhlenberg faculty, alumni, students and academic peers, as well as standardized student evaluation scores, and Dr.

3

Pan's Professional Statement. The evaluations were predominantly positive. There were, however, some neutral and negative observations. Dean Drestch rated Dr. Pan's teaching as "good to excellent," an observation Philosophy Chair Ludwig Schlecht understood to indicate that Dretsch "had some reservations." Muhlenberg Professor Christine Sistare noted that Dr. Pan "could ask more" of his students. Professor Benjamin, a member of the FEC, reported that Dr. Pan's attempts to elicit class discussion were met with modest success as only a small core of students actively participated.

The alumni and student feedback, though generally commendable of Dr. Pan's teaching, contained some unfavorable observations. While one alumnus stated that Dr. Pan was a very good teacher, he pointed out that it "was hard to follow the direction he was taking" and that Dr. Pan needed "to add some more structure to his lectures so that students can grasp the basis of his material better." Another alumnus expressed her "concern . . . that the class lacked a structured syllabus and grading policy. . . ." This alumnus stated: "I wish I could strongly recommend him [for tenure] but I want to ensure that Muhlenberg students get the best teaching possible and I feel that Dr. Pan's style needed to be changed." A third alumnus was quite positive about Dr. Pan, yet she explained that "Dr. Pan's students got out of the class what they put into it. Those who wanted to sit like a lump in the back of the room were able to . . . ." She was critical of these lackadaisical students and the fact that Dr. Pan's classes "came to be known . . . as 'blow off courses.'"

4

Muhlenberg utilized a standardized evaluation form ("SIR") completed by students in each course to rank their professors on a scale of 1 to 5, with 5 as the highest ranking. Generally, these scores were considered low if they were not over 4.0. Dr. Pan's SIRs had, as Dean Dretsch noted, "greater variability" than was typical at Muhlenberg. His initial scores were high: 4.46; 4.79; 4.18; 4.0; and 4.09. His scores declined thereafter to: 3.21; 3.67, 3.23; 3.67; 3.38; 3.09; and 3.36. Of the scores of the seven tenure candidates under consideration that year, Dr. Pan's SIRs were the lowest, with the other candidates averaging well above 4.0.

After considering Dr. Pan's tenure application and his supporting documents, and conducting a face-to-face interview, the FEC, in a report dated April 5, 1999, "voted unanimously against recommending Dr. Pan for tenure." The FEC rated Dr. Pan's teaching ability "good," but not "excellent" as Muhlenberg required for an award of tenure. The FEC characterized the evidence on the quality of his teaching as "mixed," noted that concerns were raised about his effectiveness as a teacher, cited certain comments by faculty and alumni, and found Dr. Pan's SIRs lacking in comparison to the other tenure applicants. With respect to Dr. Pan's Commitment to the Goals of the College, the FEC reported that it was concerned about Dr. Pan's view of his students because he "belittled the written work of students by name" and

> came to the interview with the Committee and handed out copies of a
> current student's poor writing. By naming the student, Dr. Pan
> demonstrated a disturbing lack of respect for the student. Also . . . Dr. Pan
> attributed the difficulty and lack of success experienced by students in his

5

courses to their prior poor education. He did not seem to be aware of his own responsibility to provide a successful educational experience for students.

Dean Dretsch notified Dr. Pan of the FEC's report. Dretsch did not think that Dr. Pan should have been granted tenure because his "performance was not up to our standards." Dean Dretsch forwarded the FEC's recommendation to President Taylor.

After receiving the FEC's report, President Taylor met with its members. In Taylor's view, there was "no light for Dr. Pan. Each one of [the FEC members] had a negative and in some cases devastatingly negative report." Taylor learned that the FEC's interview with Dr. Pan was "terrible . . . that Dr. Pan was abrasive; he was uncollegial." According to one member of the FEC, "it was the worst interview in 40 years."

In May 1999, Dr. Pan requested a review of the FEC's recommendation by the Faculty Personnel and Policies Committee ("FPPC"). After conducting a hearing, the FPPC issued its recommendation in a letter dated July 19, 1999. By a four to one vote, the FPPC found that the FEC had given inadequate consideration to Pan's teaching. The letter noted that quotes from faculty members were taken out of context and misrepresented. In the FPPC's view, the "preponderance of evidence in Dr. Pan's written file . . . points to a conclusion about Dr. Pan's teaching [that is] different from that of the FEC's." The FPPC, however, did not find any fault with the FEC's treatment of the alumni comments or the SIR scores. By a three to two vote, the FPPC recommended that President Taylor reconsider Dr. Pan's tenure application.

In addition, the FPPC noted two procedural violations: (1) the FEC's failure to notify Dr. Pan that it had received his fall 1998 SIR scores (a procedural irregularity that was not limited to Dr. Pan, but experienced by all six of the tenure candidates); and (2) the fact that the Philosophy Department and a steering committee had not formulated a composite recommendation. The FPPC, by a three to two vote, recommended reconsideration because in the absence of these procedural violations there was "at least the potential of a different outcome." The FPPC concluded its report by noting that it understood that its charge was limited and that its recommendation for reconsideration was "not an endorsement of a particular outcome."

At some point, Muhlenberg Professor Susan Schwartz, a friend of Dr. Pan's, told President Taylor that she thought "there was a racial overtone in the Pan matter." She did not substantiate her allegation. In response, President Taylor met with the members of the FPPC and noted that Pan brought a different intellectual point of view to the college and that the college needed difference. Professor Schwartz's comment also prompted President Taylor to invite Dean Dretsch, Department Chair Schlecht, and Dr. Pan to a meeting in his office to consider this allegation. During this meeting, according to Taylor, Schlecht indicated that he did not think there was any bias on the part of the FEC, "but someone who comes from [a] different culture can be misunderstood from time to time." According to President Taylor, Dr. Pan's education, experience and background were commendable, but Dr. Pan was unable to appreciate the standards that had to be met

7

for an award of tenure.

Although President Taylor reconsidered the merits of Dr. Pan's tenure bid, he chose to adhere to the FEC's recommendation to deny tenure. He acknowledged that the faculty evaluations of Dr. Pan were very positive, but explained during his deposition that "it was still bad coming out of the students. The teaching was bad. Teaching is very important." According to President Taylor, the "reason that Dr. Pan did not receive tenure is that he did not feel it was a priority to meet the standards of the college that it has been using for many, many decades."

At a final meeting between President Taylor and Dr. Pan in August, President Taylor conveyed his decision to deny Dr. Pan's application for tenure. According to Dr. Pan, Taylor

> tried to understand why the FEC was negative about my tenure eligibility. . . And he tried to understand in my favor. He said, you know, they don't understand you. They're playing American chess and you're playing go. Go means a Japanese chess game. That's why . . . they don't understand you. That's what he said. That made a deeper impression on me because he used a metaphor.

Taylor acknowledged making the comment, and explained that he was trying to make a "philosophical point" because the game of "go" "takes a very substantial mind to play" and it was "only played by people that have great respect."

Dissatisfied with the denial of his tenure application, Dr. Pan filed a charge of national origin discrimination in December 1999. The EEOC eventually filed a complaint on his behalf. The District Court granted Muhlenberg's motion for summary judgment.

8

It rejected Muhlenberg's contention that the EEOC failed to establish a prima facie case because Dr. Pan was not qualified. The Court acknowledged that Muhlenberg had offered a legitimate, nondiscriminatory reason for its action, explaining that it had denied Dr. Pan's bid for tenure because he failed to satisfy the college's standard of "excellence" in teaching required for an award of tenure. The District Court concluded that the EEOC had not demonstrated that Muhlenberg's reason for denying tenure was pretextual. The EEOC filed this timely appeal.

The District Court appropriately concluded that the EEOC established a prima facie case of discrimination. In *Bennun v. Rutgers State University*, 941 F.2d 154, 176 (3d Cir. 1991), we instructed that there is "no need to sift through [a tenure applicant's] credentials in any detail in connection with his prima facie case." It is sufficient if the evidence places the candidate in the middle group of candidates for whom tenure could be either granted or denied. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 726 (3d Cir. 1988). To be sure, Dr. Pan met this requirement.

In order to survive summary judgment when a Title VII plaintiff makes out a prima facie case and the employer has proffered a legitimate, nondiscriminatory reason for its action, "a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d

9

759, 764 (3d Cir. 1994). It is not enough to show that the employer was wrong or mistaken in taking such action because the issue is "whether the discriminatory animus motivated the employer. . . ." *Id.* at 765. Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reason that a reasonable factfinder could disbelieve it and infer that the employer did not act for the asserted reason. *Id.*

Consistent with this framework, we have instructed that a plaintiff must demonstrate more than just a denial of tenure in the context of a disagreement about the candidate's teaching abilities. *Bennun*, 941 F.2d at 170; *Molthan v. Temple University*, 778 F.2d 955, 962 (3d Cir. 1985). Accordingly, we do not sit "as a super tenure review board . . . . It is not for us to weigh the evidence and determine whether we agree with the University's assessment. . . ." *Roebuck*, 852 F.2d at 731. As we recognized in *Equal Employment Opportunity Commission v. Franklin and Marshall College*, 775 F.2d 110 (3d Cir. 1985), "it is neither for the EEOC nor for the courts to reevaluate a candidate's qualifications . . . . The oft times difficult decision to promote or to grant tenure shall be left exclusively to this nation's colleges and universities so long as the decisions are not made, in part large or small, upon statutorily impermissible reasons." *Id.* at 117 (citation omitted).

After a thorough review of the record, we conclude that a reasonable factfinder could not conclude that the decision to deny Dr. Pan's tenure application was motivated

10

by a discriminatory animus. At most, the evidence establishes that there was a disagreement about Dr. Pan's teaching abilities. The FEC determined, after reviewing Dr. Pan's written file and interviewing him personally, that Dr. Pan's teaching, though "good," did not meet the standard of "excellence" required for tenure. The FPPC, however, concluded that the FEC had not given adequate consideration to Dr. Pan's written file. Yet nothing in the report of either the FEC or the FPPC suggests that Dr. Pan's heritage played any part in the denial of his tenure application.

The EEOC equates the FPPC's report with the grievance committee's report in *Stewart v. Rutgers State University*, 120 F.3d 426 (3d Cir. 1997). There, we reversed a grant of summary judgment for the University, explaining that the District Court had failed to consider the grievance committee's conclusion that the denial of tenure was arbitrary and capricious and that such evidence was probative of a racial animus. *Id.* at 434 n.5. *Stewart* is distinguishable on its facts and is not controlling. Unlike *Stewart*, where the professor specifically alleged race and gender discrimination, and the grievance committee observed that some of the University's conduct was not consistent with its affirmative action initiatives, there is nothing in the FPPC's report suggesting that Dr. Pan's nationality adversely affected his bid for tenure. Moreover, while the grievance committee in *Stewart* stated that the professor's rejection "could not have been reached by reasonable evaluators," 120 F.3d at 430, here there was evidentiary support in the negative statements by alumni and the low SIRs, as well as in the less-than-favorable

11

personal interview, to support the FEC's conclusion that Dr. Pan failed to meet Muhlenberg's standard for tenure which was "excellence in teaching." Indeed, even the FPPC noted that the FEC had neither misrepresented the alumni comments nor placed inappropriate reliance on Dr. Pan's SIRs.

We recognize that two deviations from Muhlenberg's rules occurred. Neither procedural irregularity can be reasonably related to Dr. Pan's nationality, as our description of them, *supra*, makes clear. Accordingly, these irregularities can not cast doubt on Muhlenberg's reason for denying tenure, and do not give rise to an inference that an anti-Chinese animus flavored the FEC's recommendation. *Cf. Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (rejecting contention that series of procedural irregularities in tenure process showed discriminatory intent because there was no evidence that plaintiff's sex played a role in the alleged irregularities); *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) (acknowledging that procedural irregularities may raise question as to reliability of the tenure decision, but pointing out that irregularities at issue were not race related).

Nor are we persuaded that President Taylor's remark about Dr. Pan playing "go" is evidence that Taylor's decision to adhere to the FEC's recommendation was based on Dr. Pan's heritage. We agree with the District Court that this remark "referred to the interaction between the FEC and Dr. Pan, rather than his own views."

The other comments regarding Dr. Pan's culture do not give rise to inference of

discrimination either. They were made in the midst of inquiring into Professor Schwartz's unsubstantiated allegation that the denial of tenure was marred by racial overtones. Indeed, Professor Schwartz's statement, which is inadmissible for purposes of establishing the existence of a discriminatory animus, *see Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999), was the event that prompted Taylor to inquire into the issue of Dr. Pan's culture. Title VII encourages employers to heed allegations of this nature. No employer should be placed in a Catch-22 where it may face liability because it has failed to respond to an allegation of discrimination, and also face liability because it has in fact responded. An inquiry into an allegation of discrimination should not itself become evidence of discrimination merely because those charged with conducting the inquiry have discussed the allegation frankly and considered all the possibilities. As always, statements by an employer must give rise to a *reasonable* inference of discrimination before a jury question is presented. *Cf. Lim v. Trustees of Indiana Univ.*, 297 F.3d 575, 580 (7th Cir. 2002) (concluding that president's letter acknowledging concern about tenure was not inappropriate in light of the fact that an EEOC charge had been filed and that it was speculation to conclude that the letter established discriminatory intent).

In sum, we conclude that the EEOC failed to show more than a denial of tenure in the context of a disagreement about Dr. Pan's teaching ability. There is nothing to reasonably suggest that Dr. Pan's Chinese heritage was a factor in Muhlenberg's decision

13

to deny tenure.[2]  Accordingly, the District Court did not err in granting summary

judgment for Muhlenberg.  We will affirm the judgment of the District Court.

---

2 While we hold that there is insufficient evidence in the summary judgment record to show that the University's tenure decision was based on race or national origin, our opinion should not be interpreted as expressing any view as to whether the University was correct in its evaluation of Dr. Pan' s abilities as a scholar or teacher.  Those are questions that we have neither the authority nor the expertise to decide.