**P. Robert REED, Plaintiff,**

v.

**AGILENT TECHNOLOGIES, INC. Defendant.**

**No. CIV. A. 98–582–GMS.**

United States District Court, D. Delaware.

Nov. 19, 2001.

---

**28.** *Mario Valente,* 115 F.Supp.2d at 370–71.

Reed alleges that HP terminated his employment solely because of his race. Presently before the court is Agilent's motion for summary judgment. After reviewing the record in the light most favorable to Reed, the court concludes that he cannot establish his claims as a matter of law, and, therefore, will grant Agilent's motion for summary judgment.

The following sections explain the reasons for the court's decision more thoroughly.

## II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173–174 (3d Cir. 1999).

Gary W. Aber of Heiman, Aber, Goldlust & Baker, Wilmington, DE, for Plaintiff.

Steven J. Balick and Steven T. Margolin of Ashby & Geddes, Wilmington, Delaware Of Counsel: Thomas J. Flaherty and Blake M. Guy of Hunton & Williams, McLean, Virginia, for Defendant.

### *MEMORANDUM OPINION*

SLEET, District Judge.

## I. INTRODUCTION

The plaintiff, P. Robert Reed ("Reed"), filed suit against his former employer, Hewlett–Packard ("HP"), for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2000) and the covenant of good faith and fair dealing under Delaware state law.[1] In his complaint,

---

1. On March 21, 2001, the court granted Agilent Technologies, Inc. ("Agilent") leave to proceed as the substituted defendant in this action in order to reflect the fact that the division of HP where Reed worked is now owned by Agilent.

With these standards in mind, the court will describe the facts that led to the present motion.

## III. BACKGROUND

From May 1995 until HP terminated him, Reed was the Product Line Manager for the Columns & Supplies ("C & S") organization in the Little Falls Analytical Division (the "LFAD") located in Wilmington, Delaware.[2] The LFAD was one of four divisions within HP's Chemical Analysis Group ("CAG"). CAG was one of several groups within HP's Measurement Systems Organization ("MSO"). MSO was one of six organizations that comprised HP at the time.

As of May 1996, Douglas Carnahan ("Carnahan") was the General Manager of MSO. Rick Kniss ("Kniss") served as the General Manager of CAG, and Nancy Kerins ("Kerins") served as the General Manager of the LFAD. Reed was one of eight functional managers reporting to Kerins at the LFAD facility. As the Product Line Manager for C & S, Reed was responsible for overseeing the research and development, marketing, manufacture and distribution of HP's gas and liquid chromatography columns and supplies.

### A. HP's Acquisition of Rockland Technologies, Inc.

In 1995, Reed authorized the formation of a customer focus group in order to identify ways to expand the liquid chromatography ("LC") business of the C & S organization. Ultimately, the focus group aided Reed in reaching the conclusion that acquiring Rockland Technologies, Inc. ("RTI") was the best means of improving the organization's LC market share.

Reed first discussed the proposed acquisition of RTI with Kniss, the General Manager of CAG. Kniss suggested that Reed prepare a more formal proposal for further consideration by Carnahan, Kniss, and Kerins. Accordingly, in March 1996, Reed and Margaret McCarthy ("McCarthy"), HP's Corporate Development Manager, made a presentation seeking authority to pursue the acquisition of RTI.

Following Reed's second presentation in April 1996, Carnahan granted him authority to negotiate with RTI. Carnahan authorized Reed to offer no more than twenty million dollars for the purchase of the company. HP considered the twenty million dollars to be a firm "walk away" price. The twenty million dollar purchase price that Carnahan authorized did not contemplate a withdrawal of working capital prior to closing the acquisition. This was because any decline in the amount of working capital would effectively mean that the price HP paid would increase by an amount equivalent to the decline in capital. There is no dispute that Reed understood that he had no flexibility to negotiate above the twenty million dollar offer price.

From the outset, HP expected that RTI would be incorporated into C & S following the acquisition. Consequently, Reed was responsible for orchestrating and directing the anticipated combination of HP and RTI. Reed acknowledged that, as the product manager responsible for directing HP's acquisition of RTI, he "was driving the deal." However, Kerins instructed Reed that, should he wish to deviate from the established financial parameters established by Carnahan, he must first report back to Kerins, Kniss, or Carnahan. All three of these people possessed higher levels of authority than Reed. Reed also had

---

2. Reed's employment with HP began in 1970, however, a full recitation of how Reed came to be the Product Line Manager in 1995 is not warranted for purposes of deciding this motion.

the task of ensuring that Kerins, and those above her in the chain of command, were appraised of any new developments in the acquisition. In fact, Reed demonstrated his understanding of these expectations when he informed Kerins and Kniss that the owners of RTI were seeking additional compensation for proposed non-compete agreements. On that occasion, Kerins and Kniss authorized Reed to increase HP's offer, but only in relation to those non-compete agreements.

Following a relatively brief negotiation period, RTI agreed to a final purchase price of twenty million dollars. During a meeting shortly thereafter, RTI informed Reed and McCarthy that they wanted to withdraw approximately two million dollars of RTI's working capital prior to closing the acquisition. The consequence of permitting RTI to make this withdrawal after settling on a final purchase price was the diminution of the tangible assets that HP would receive in the acquisition. Reed concedes that he was aware that allowing RTI to make this withdrawal effectively increased the purchase price for RTI from the authorized twenty million dollars to twenty-two million dollars. Reed's acknowledgment of this fact is memorialized in a letter he wrote to HP's Chief Executive Officer after the termination of his employment. In that letter, he stated, "[b]ecause of a change in the balance sheet, we paid two million more for the company than I was authorized to pay." Reed further agreed that his actions "could be considered beyond the negotiating limits originally set by HP management." Despite Reed's clear understanding that he was exceeding the authority given to him by Carnahan, he agreed to permit this two million dollar withdrawal.

On August 13, 1996, HP and RTI signed a Term Sheet setting forth the twenty million purchase price. Neither the Term Sheet, nor the subsequent Merger Agreement, specifically described the two million dollar withdrawal that Reed had unilaterally authorized. At no time prior to the closing of the acquisition did Reed inform Kerins, Kniss, or Carnahan about the existence of the withdrawal agreement, or obtain their approval of this aspect of the deal.

As a condition to completing due diligence with RTI, HP agreed to execute the Term Sheet, and eventually a Distribution Agreement, with RTI's exclusive U.S. distributor, Mac–Mod. As the business manager in charge of the acquisition, Reed was responsible for ensuring that the terms of any Distribution Agreement with Mac–Mod were consistent with the financial parameters established by Carnahan. Reed maintains, however, that he was not involved in the day-to-day negotiations with Mac–Mod. Instead, he claims he delegated that function to his immediate subordinate, John Nichols ("Nichols"). Nonetheless, as the overall team leader for the acquisition of RTI, Reed was ultimately responsible for accepting the proposed financial terms of the final Distribution Agreement.

At the beginning of negotiations, in order to preserve the overall value of the acquisition to HP, Kerins specifically instructed Reed that the financial terms of any Distribution Agreement between HP and Mac–Mod must be no more favorable to Mac–Mod than the financial terms set forth in the Distribution Agreement between RTI and Mac–Mod. In order to obtain the full value of the deal originally contemplated in April 1996, it was essential that the distribution expenses that HP incurred be no greater than the expenses that RTI had incurred. The Distribution Agreement in place at that time between RTI and Mac–Mod provided Mac–Mod with a forty percent discount off the list

price of products purchased from RTI and subsequently distributed by Mac–Mod. RTI did not provide any additional compensation to Mac–Mod for customer support services provided by Mac–Mod to the purchasers of RTI's products.

Although Kerins repeatedly asked Reed about the status of the negotiations with Mac–Mod, Reed did not inform her, let alone seek her approval, of the financial terms that he authorized in the final agreement. Additionally, Reed admits that he never calculated the overall compensation provided to Mac–Mod by HP as a result of the financial terms ultimately set forth in the Distribution Agreement. It was only later that Kerins discovered that the terms of the Distribution Agreement negotiated by Reed failed substantially to achieve parity with the terms of the agreement between RTI and Mac–Mod.

The Distribution Agreement provided for HP to pay Mac–Mod an annual "conversion fee" in the amount of six-hundred thousand dollars, as well as undefined "factory support fees." Both of these fees, to which Reed unilaterally agreed, were to be paid in addition to the discount Mac–Mod was receiving off the list price of HP products that it purchased. Reed's Distribution Agreement thus increased HP's distribution costs beyond the costs previously expended by RTI. Accordingly, the Distribution Agreement lowered HP's anticipated revenue and decreased the value of the RTI acquisition. Moreover, HP's Distribution Agreement with Mac–Mod did not require any specific level of customer support before Mac–Mod received its factory support fees. In other words, under the terms of the Distribution Agreement to which Reed acceded, Mac–Mod received compensation from HP for customer support regardless of whether or not Mac–Mod actually provided such services.

The final result was a Distribution Agreement in which HP extended far more favorable terms to Mac–Mod than Mac–Mod received under its Distribution Agreement with RTI. In contrast to the forty percent discount Mac–Mod received from RTI, Reed unilaterally gave Mac–Mod an effective discount of just under forty-four percent. This result was directly contrary to the instructions that Kerins gave Reed at the outset of the negotiations with Mac–Mod.

Reed further extended a forty-five day credit cycle to Mac–Mod. This was a deviation from HP's standard thirty-day cycle for its distributors. The effect of this extension was to provide Mac–Mod with more superior credit terms than HP's other distributors. As with the other terms of the Distribution Agreement, Reed never conferred with Kerins regarding the extension of a forty-five day credit cycle to Mac–Mod. Additionally, Reed's actions were in direct violation of HP's Standards of Business Conduct. The relevant section provides that, "HP should not offer different prices or services to competing resellers of the same product."

Reed and Nichols also failed to resolve the issue of whether HP would issue Mac–Mod credit on an unsecured basis. Mac–Mod and HP discussed the credit issue time and again during the negotiating process, and Mac–Mod was assured that credit would not be unduly withheld by HP. However, HP's credit department informed Mac–Mod days after the acquisition closed that Mac–Mod would not be permitted to operate with unsecured credit, as it had with RTI. Mac–Mod's inability to obtain sufficient credit from HP severely impaired its ability to deliver products, and thereby jeopardized the entire line of business. As the HP employee responsible for negotiating and executing the Dis-

tribution Agreement with Mac–Mod, Reed was accountable for this situation.

Further, Reed exceeded his authority with regard to the RTI acquisition by agreeing on behalf of HP to hire and pay fifty thousand dollars to an RTI employee, Andre Dams ("Dams"). Dams, who was based in the Netherlands, sent a letter to Reed on October 4, 1996 demanding, *inter alia*, that HP make a lump sum payment to Dams for the purpose of funding his pension. By the end of October, Dams was contacting Reed nearly twice a week seeking to address his pension demands. Specifically, Dams sought compensation to "bridge the gap" for the loss of pension benefits that Dams believed he would incur as a result of accepting employment with HP. Dams, however, only had an employment contract with RTI. This contract could have been terminated. Moreover, HP management did not consider Damns to be critical to the acquisition. As such, HP did not have to agree to hire Dams as an HP employee, although it ultimately agreed to do so.

In December 1996, Dams demanded that HP continue paying the premiums for his current pension plan with RTI. In addition, Dams insisted that HP provide him with service credit for his prior years of employment with RTI. Although HP was required to offer Dams a pension plan, HP was not obligated to continue the same plan as the one Dams had with RTI. Moreover, as a matter of company policy, HP does not give service credit toward pension benefits for the employees of a company that HP is about to acquire. During his deposition, Reed acknowledged that he clearly understood this company policy.

Kathy Kopp ("Kopp"), a human resources specialist with HP, was a member of Reed's acquisition team. Kopp was authorized to speak on behalf of HP's Corporate Personnel Department, and was expected to advise Reed regarding HP's official hiring and benefits policies. In late 1996, Kopp instructed Reed that HP was required to offer Dams a pension plan, but should not offer anything in the way of additional compensation. On multiple occasions thereafter, Kopp counseled Reed that HP was under no legal obligation to compensate Dams for any potential loss of pension benefits that Dams might incur as a result of accepting employment with HP.

On January 27, 1997, Kopp promptly and emphatically responded to an e-mail message from Reed's immediate subordinate Nichols, stating that, "HP Corporate Benefits has been very clear about the fact that we should NEVER give service credit toward retirement benefits." Kopp strongly recommended that HP not even give Dams the impression that this was a negotiable point. Kopp also sent a copy of this response to Reed.

In early 1997, Nichols was informed that "bridging the gap" between Dams' prior pension plan and HP's pension program would require paying Dams one-hundred and thirty thousand dollars. Nichols subsequently informed Reed that RTI had agreed to contribute eighty thousand dollars toward this payment. Without seeking approval from Kerins or Kopp, Reed then agreed to contribute fifty thousand dollars on behalf of HP in order to "bridge the gap" between the two pension programs. At no time prior to the closing did Reed inform Kerins or Kopp of his agreement. Thus, in lieu of giving Dams service credit for time served in RTI's pension program, Reed simply compensated Dams directly. The fifty thousand dollar commitment Reed made was an unexpected cost that HP bore directly.

Reed was well aware that his actions with regard to Dams exceeded his authority. On March 4, 1997, in a voice mail

message to Kerins after she had demanded an explanation from him, Reed stated:

> I think with regard to the [Dams] situation, I think the way to fix this is to go to [ ] Larmann and tell him that *I wasn't authorized to sign for the $50K* for [Dams] and additionally point out that the action we took is clearly against an HP policy, etc. . . . (emphasis added.)

The next day, Reed further explained his actions in an e-mail to Kerins by writing:

> Even though my letter is legally binding for HP, I can explain to [Larmann] that it is not appropriate for HP to do this. . . . [I]t is my intention to ask [Larmann] to 'forgive' this commitment by HP. After pushback on the amount, it was John Nichols and he who agreed to this figure and *I signed off on it.* (emphasis added.)

By then, however, it was too late to rescind its commitment, as HP had already incurred this additional cost of the acquisition.

### B. HP's Open Door Policy

HP's Open Door Policy states: "[t]he employee may seek counsel from a manager, a member of the personnel department or an individual at any level of management with the assurance that no adverse consequences will result from the action." Reed clarified that his understanding of this policy meant that "virtually anyone in the company could go to any other individual, whether in management or not, and discuss whatever they wanted to discuss." The Open Door Policy further may be used to "share feelings and frustrations in a constructive manner." Managers and supervisors are instructed that they should not "make the employee feel he/she can't pursue higher level management" and should not "make a decision or pass judgment until [they] have full information."

Early during the week of April 7, 1997, Paul Powell ("Powell"), a subordinate employee within Reed's organization, received a telephone call from an outside vendor who raised various allegations of misconduct pertaining to one of HP's Product Managers in the C & S organization. Powell promptly reported the vendor's complaints to Robert Kriner ("Kriner"), Powell's acting supervisor at that time. Kriner instructed Powell to put the issues in writing. Powell subsequently drafted a five-page memorandum which documented his conversation with the vendor, as well as several of Powell's own critical observations regarding Reed's organization. On the afternoon of Friday, April 11, 1997, Kriner informed Reed of Powell's conversation with the vendor. Reed then contacted Michael Jenkins ("Jenkins"), the Human Resources Manager at the LFAD, and scheduled a meeting between Jenkins and Powell for April 14, 2001.

On April 14, 2001, Kriner and Powell discussed the issues raised in Powell's memorandum. Following this meeting, Kriner provided Reed with a copy of Powell's memorandum. Reed testified at his deposition that he glanced quickly at the first two pages of the memorandum, but did not read the document. It is undisputed that Reed then told Kriner that he did not want the memorandum used during Powell's meeting with Jenkins. During the meeting between Jenkins and Powell, Jenkins asked to examine the memorandum. Powell stated that he could not provide Jenkins with a copy of it as per Reed's instructions. In a contemporaneously written memorandum memorializing the meeting, Jenkins wrote that Powell stated at that time he felt threatened by the pressure exerted by Reed. Jenkins also noted that Powell feared retribution from Reed if he turned over the memorandum. Ultimately, however, Powell did

provide Jenkins with a copy of the memorandum.

Kerins, Jenkins, and Kniss concluded that Reed's conduct toward Powell was in direct violation of HP's Open Door Policy. In their business judgment, this incident, standing alone, provided sufficient grounds for Reed's termination.

### C. Reed's Termination

Prior to the Powell incident, no final decision had been made as to Reed's continued employment with HP. Indeed, Kerins did not have the authority to terminate Reed's employment unilaterally. Such a decision required Kniss' approval, since he was the General Manager of CAG. Accordingly, only after obtaining the unanimous approval of Kniss, Jenkins, and Jenkins' direct supervisor, Deihleen Claffey, did HP decide to terminate Reed. HP informed Reed of its decision, and the reasons therefore, on April 22, 1997. Winfred Sanders ("Sanders") replaced Reed in July 1997.

With this background in mind, the court will turn to the substance of Agilent's motion for summary judgment.

## IV. DISCUSSION

### A. Title VII Race Discrimination

Reed alleges that HP terminated him because he is white, and it wished to replace him with a so-called minority in furtherance of its diversity policy.

Discrimination claims under Title VII are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Although the burden of going forward shifts between the plaintiff and the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

To establish a *prima facie* case of "reverse discrimination," a plaintiff must present "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of [his] race.' " [3] *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir.1999) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). Once a plaintiff has demonstrated a *prima facie* case of discrimination, the burden of production shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for its actions. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. Finally, if the defendant is able to successfully articulate such a reason, the burden then shifts back to the plaintiff to show that the defendant's non-discriminatory reason for the termination was pretextual, and that the real reason for the termination was unlawful discrimination. *See id.* Although the *prima facie* case, and the inferences drawn therefrom, may still be considered at the pretext stage, this evidence must be combined with sufficient other evidence to permit the trier of fact to conclude that the employer intentionally discriminated against the plaintiff. *See Reeves v. Sanderson Plumbing Prods.*,

---

**3.** The court will use the term "reverse discrimination" in this opinion, both to avoid confusion in the case law, and in light of its adoption by the Third Circuit. The court does not, however, believe that this term is appropriate or meaningful. In the court's view, where discrimination exists, against whomever it is directed, discrimination is discrimination—"reverse" or otherwise.

*Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### 1. Reed's Prima Facie Case

The factual support that Reed offers to establish a *prima facie* case of racial discrimination against him is HP's diversity policy. The court rejects the contention that the existence of a diversity policy within a non-governmental institution, such as HP is, without more, is sufficient to meet Reed's burden.

 Reed first argues that, because the LFAD tracks its utilization of women and minorities, it is treating white employees less favorably. However, the fact that an employer maintains statistical awareness regarding diversity issues in the workplace is not evidence of discrimination. In the present case, the LFAD is a government contractor. As such, it is legally required to monitor its utilization of women and minorities. Moreover, Reed has adduced no record evidence that it did anything other than track its compliance with the minimum utilization expectations established by the federal government. Reed has simply produced no evidence to indicate that this tracking was somehow inappropriate.

 Reed has further adduced no evidence that anyone at HP perceived that minorities were underutilized at the functional manager level in the LFAD. In fact, the tracking information indicates that there was statistically no need to hire additional minority or female functional managers. During the last quarter of 1996 and the first quarter of 1997, the percentage of black functional managers at the LFAD exceeded their national "availability" as provided by the federal government.[4] This percentage also exceeded the goals set by CAG and the LFAD. Statistically, therefore, the LFAD had no need to replace Reed with a minority manager in order to achieve compliance with federal expectations. As such, Reed's contention that the LFAD "had not *increased* its representation of minorities among functional managers" as of September 1996 is irrelevant. (emphasis added).

Reed next contends that "significant management pressure" was being applied to "increase the number of women and minorities at the functional manager level." He provides no evidence to substantiate this conclusion. To the contrary, Reed, a functional manager himself, testified at his deposition that he had never felt pressured, and never pressured his subordinates, to hire or promote people simply to fulfill any minority quotas.

Although Reed also alleges that minority employees at the LFAD expressed feelings of a glass ceiling and an "ole' boys' network," he again fails to point to any evidence of who those employees were or when such comments were made. As such, this conclusory allegation must be disregarded on a motion for summary judgment. *See Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991).

Finally, and most important, Reed has failed to adduce any evidence that diversity awareness at the LFAD was ever relied upon in making or implementing specific employment decisions with regard to him. Unless he can demonstrate that HP's approach to diversity had some negative impact upon *his* individual employment situation, the mere existence of a policy promoting diversity awareness is not evidence of discrimination. *See Lutes v. Goldin,* 1999 WL 689303, *11 (D.D.C. Aug.30, 1999). Merely producing anecdo-

---

4. The percentage of black functional managers at the LFAD for that time period was 9.1%. Conversely, the government "availability" percentage was 2.5%.

tal evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient. *See McHenry v. Pennsylvania State Sys. of Higher Ed.*, 50 F.Supp.2d 401, 412 (E.D.Pa.1999). Instead, Reed must show that such policies were "actually relied upon" in deciding to terminate his employment. *See id.; see also Harel v. Rutgers Univ.*, 5 F.Supp.2d 246, 266 (D.N.J.1998).

Reed has brought forth no evidence sufficient to establish the required nexus between HP's diversity policy and the specific decision to terminate his employment. He alleges that six months prior to his termination, "Kerins had told Rick Kniss that Reed's position would become vacant." However, neither this bald assertion, nor Reed's own deposition testimony on this matter, demonstrate the required nexus. Reed admits that he bases this assertion on a conversation he had with another person, who in turn, according to Reed, said that he overheard Kerins' end of a telephone call with Kniss. Not only is this allegation conclusory, there is serious doubt as to its admissibility as evidence. Such statements cannot withstand summary judgment. *See Quiroga v. Hasbro*, 934 F.2d 497, 500 (3d Cir.1991) (holding that conclusory allegations and vague assertions will not withstand a motion for summary judgment.); *see also Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir.1993) (noting that evidence offered in opposition of a motion for summary judgment must be *admissible* evidence) (emphasis added).

In his answering brief, Reed further claims that in "March 1997, Kerins had told a European employee, Lynn Jarke, that Reed was going to be replaced." Reed attributes this statement to Nichols, but Nichols conceded that he did not know when Kerins and Jarke spoke, nor does he recall when he spoke to Jarke. While it is thus in dispute when this conversation took place, that alone is not sufficient to deny summary judgment. Whether and when this conversation took place is irrelevant because the conversation itself is wholly immaterial. Regardless of when it took place, it fails to establish that HP was relying on its diversity policy in terminating Reed. Because this conversation, even when viewed in the light most favorable to Reed, will not effect the outcome of the suit, this disputed conversation will not preclude the entry of summary judgment. *See Charlton v. Blue Cross & Blue Shield*, 2001 WL 694533, at *2 (D.Del. June 20, 2001) (internal quotations omitted) (noting that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

In sum, Reed has accomplished nothing more with his "evidence" than to demonstrate that, for a variety of reasons, the need for a diverse work force in the new millennium perhaps among them, HP has deemed it desirable to implement what appears to be a legally appropriate affirmative action policy in an apparently legally acceptable fashion. For the court to sanction the idea that such concerns could be used against a company as evidence of discrimination on bare facts such as these would seem irresponsible. Indeed, courts in other jurisdictions have also recognized this danger by holding that rare indeed is the occasion when a lawful affirmative action plan can be cited as evidence of discriminatory animus. *See Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001); *Lutes v. Goldin*, 62 F.Supp.2d 118, 131 (D.D.C.1999). Such diversity awareness programs are necessary to remedy past discrimination against minorities and women. Further, they ensure that companies such as HP have the ability to hire a workforce that will enable it to effectively

service an increasingly diverse customer base. This is to say nothing of the laudable goal of expanding the horizons of opportunity for more and more members of this great pluralistic society. To be sure, this is not to say that Caucasian males should now be discriminated against. No contrary conclusion is supported by the record presently before the court.

For these reasons, the court finds that Reed has proffered no evidence that he was treated less favorably, held to different standards or otherwise dismissed on account of his race. *See Iadimarco,* 190 F.3d at 163. Accordingly, Reed has failed to meet his burden of establishing a *prima facie* case of discrimination.

**2. Agilent's Legitimate, Non–Discriminatory Reasons for Reed's Termination**

■ On the other hand, Agilent has articulated ample legitimate reasons for its decision to terminate Reed. Reed admits that he exceeded his authority on several occasions in relation to the RTI acquisition. His actions ultimately forced HP to pay two million dollars more than it had planned to pay for RTI, and jeopardized at least one of HP's business relationships. Reed also admits that he, through Kriner, ordered Powell not to utilize a memorandum Powell had written in preparation for a meeting in accordance with the Open Door Policy. Reed's supervisors maintain that this action was a violation of HP's Open Door Policy. Together, his supervisors determined that, in light of his "extremely poor judgment in the recent execution of [his] management responsibilities," and his violation of HP's Open Door Policy, they had no choice but to terminate him.

HP has thus met its burden of articulating several legitimate, non-discriminatory reasons for Reed's termination. *See Jalil*

*v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir. 1988) (noting that a failure to follow an employer's directions is a legitimate and nondiscriminatory reason for dismissal.)

**3. Pretext**

Finally, Reed claims that Agilent's articulated reasons for his termination are pretextual.

■ A plaintiff may not avoid summary judgment merely by showing that the employment decision was wrong, or even mistaken. *See Fuentes v.. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). Such a standard is necessary in order to maintain an appropriate balance between the discrimination laws and the independence of private employers. *See id.* at 765; *see also Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (holding that anti-discrimination statutes were not intended to "diminish traditional management prerogatives.") Specifically, an employer "has the right to make business judgments on employee status, particularly where the decision involves subjective factors . . . that the [employer] deems essential to high-level executive positions." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1220 (3d Cir.1988). Rather, a plaintiff must submit either direct or circumstantial evidence from which the factfinder could conclude that the proffered reasons are not credible and that, as a result, discrimination was more likely than not a motivating cause of the employment decision. *See Fuentes,* 32 F.3d at 765. Reed cites several instances that he argues show pretext. As the court will discuss below, each of his assertions must fail for the simple reason that he has adduced no evidence that would enable a reasonable jury to find that HP acted with discriminatory animus.

■ First, Reed's overarching argument is that the existence of a diversity policy itself shows pretext. In making this argument, however, Reed encounters the same deficiencies in his case that the court cited during its *prima facie* case analysis in Section A.1. Again, the present record fails to establish that HP's diversity policy in and of itself had any impact on Reed's employment. For that reason, and for the reasons set forth in its discussion on this topic in Section A.1, the court again rejects Reed's arguments.

Reed next argues that HP's stated reasons for terminating him demonstrate the required discriminatory animus. Again, Reed has presented no evidence to support his claim. First, with regard to the purchase price of RTI, Reed claims that it was actually Kerins who was inept, when he himself was "an experienced business manager with an exemplary record." Reed thus claims that HP made him the "fall guy" for her mistakes and "undocumented accusations." Specifically, Reed says that it made good business sense to allow RTI to withdraw the two million dollars of working capital prior to closing. The court, however, declines to examine the propriety of Reed's actions. More specifically, it is not reasonable to expect the court to substitute its judgment for that of the HP officials who established the parameters for the RTI acquisition. Whether Reed's actions were ultimately a benefit to HP or not, the simple, uncontroverted fact remains that Reed exceeded those parameters, and his authority, by allowing the two million dollar withdrawal without prior approval.

Reed readily admits that he exceeded his authority in this regard. In a letter he later wrote to HP's Chief Executive Officer, he stated, "[b]ecause of a change in the balance sheet, we paid two million more for the company than I was autho-

rized to pay." He further agreed that his actions "could be considered beyond negotiating limits originally set by HP management." In light of these admissions, the court finds that no reasonable jury could find that terminating Reed for exceeding his authority was pretext for discrimination. *See Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1109 (3d Cir.1997) (holding that a plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.").

Reed next alleges that his actions with regard to RTI's employee Dams were not sufficient to terminate him, and as such, were a pretext for HP's discriminatory animus. Reed argues that Dams was a valued RTI employee in Europe, whose continued employment was essential to HP's success in this acquisition. Reed further argues that Dutch law required him to compensate Dams in some form for his prior service with RTI. As above, he thus maintains that he is being blamed for the ineptitude of his supervisors for not understanding that what he did was in HP's best business interests. The court again declines to address the propriety of Reed's actions in a business sense. Reed admits that he acted wholly without authority by agreeing to the fifty thousand dollar bridge payment to compensate Dams for his pension losses. Because there is no dispute that Reed exceeded his authority, the court concludes that no reasonable jury could find that HP's actions with regard to this matter were pretextual. HP was well within its rights to consider Reed's actions with regard to Dams in determining whether to terminate him. Again, whether HP was correct in its decision on this matter is not for the court to decide. *See Healy,* 860 F.2d at 1220 (recognizing that an employer "has the right to make business judgments on em-

ployee status, particularly where the decision involves subjective factors...that the [employer] deems essential to high-level executive positions.").

Reed next argues that HP was mistaken in determining that he gave Mac–Mod a forty-four percent discount. Thus, Reed would have the court find that this is evidence of pretext. The court declines to so find. Reed engages in a lengthy discussion of why HP was wrong about the actual discount amount he authorized for Mac–Mod. Whether HP was actually wrong, however, is irrelevant for purposes of deciding pretext. It is well-settled that courts will not deem reasons for termination based on mistake to be evidence of pretext. Instead, there must be a showing that discrimination, not the proffered reason, actually motivated the employer. *See Fuentes*, 32 F.3d at 765. Reed has failed to adduce any evidence that this reason for his termination was a post hoc fabrication, or that it did not otherwise actually motivate HP. Accordingly, on the record before it, the court cannot find pretext in this employment decision.

Next, Reed argues that HP's decision to terminate him for an alleged violation of HP's Open Door Policy is pretextual. HP's Open Door Policy encourages all HP employees to discuss with their managers any concerns they have. Reed acknowledges that the Open Door Policy was clear to him. Notwithstanding this policy, however, there is no dispute that in April 1997, Reed forbade a subordinate employee, Powell, from using a memorandum that he had prepared in preparation for a meeting with management. Powell's memorandum addressed concerns an HP vendor had expressed earlier to him regarding another employee. It also allegedly addressed Powell's own concerns with Reed.

There is a dispute as to whether Reed knew the memorandum was also critical of him when he ordered Kriner to tell Powell not to use it during the meeting. There is also a dispute as to the manner in which Reed's request was communicated to Powell. However, neither of these issues is material to this motion. It remains undisputed that Reed was displeased with Powell's memorandum to the point that he ordered Kriner to tell Powell not to use it as written. Further, there is no dispute that Kriner communicated that request to Powell. As such, Reed concedes that he interfered with Powell's right to use the kind of material he wanted to use, in the form he wanted to use it, during his meeting with HP management.

On these facts, HP decided that Reed's behavior was in violation of its clear Open Door Policy. Reed has adduced no evidence that this decision was somehow related to his race. Nor has he brought forth any evidence that this decision was anything other than a routine business judgment, which HP is entitled to make, free from the court's interference. *See Healy*, 860 F.2d at 1220. Accordingly, the court again finds that, based on this record, no reasonable jury could find that HP's decision was pretextual.

Finally, Reed attempts to establish pretext by focusing on the selection of his successor. The critical inquiry in determining whether pretext exists is "whether [race] was a factor in the employment decision *at the moment it was made.*" *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Thus, the employment decision at issue here is the decision to terminate Reed's employment with HP in April 1997, not the process used to select his successor, three months later in July 1997.[5]

5. Reed points to the selection of his successor as evidence of discrimination because Sand-

Nevertheless, Reed goes to great lengths to point to pretext in Sanders' selection as his successor. First, he argues that Sanders was not qualified for a job as a functional manager. As the basis for this argument, Reed points to allegations of poor performance reviews Sanders received from HP in the past. Sanders' performance reviews, absent more, are simply not relevant to this inquiry. Reed concedes that once HP terminated him, anyone could apply for his position. He has produced no evidence that Kerins contacted Sanders about applying for the position, much less that she encouraged him to do so. In fact, the four HP employees that Kerins did contact in order to solicit applications were all white. Kerins later ranked one of these candidates, who later withdrew from the interview process for personal reasons, as the best candidate.

Reed next contends that the two unsuccessful candidates who participated in the interview process with Sanders were chosen by Kerins specifically because they were not qualified.[6] However, because Reed's assertions on what he considers "qualified" are conclusory at best, the court again declines to second-guess HP's interview decisions. It bears noting that what Reed considers to be required qualifications for his position are not necessarily what HP, in the appropriate exercise of its business judgment, views as requirements. Thus, because of the dearth any evidence whatsoever of discriminatory animus with regard to the applicant's qualifications, the court refuses to delve further into HP's legitimate business decisions.

Finally, Reed attempts to argue that HP did not follow its own procedures in hiring Sanders. Reed would thus have the court find that this alleged failure, three months after HP terminated him, is evidence of pretext in his termination. Specifically, HP procedure dictates that every interviewee must be interviewed by every member of the interview team on each of two days. Reed maintains that for a selection process to be valid, this procedure must be followed. In this case, Reed alleges that one of the interviewer's score sheets for Sanders is missing. This, Reed concludes, is evidence that one of the interviewers did not score Sanders on one of the interview days. As such, Reed believes that the interview procedure was tainted.

As authority for this proposition, Reed cites to *Stewart v. Rutgers*, 120 F.3d 426 (3d Cir.1997). The facts of *Stewart*, however, are not analogous to the present facts. There, the court held that, where a tenure committee ignored the existence of established procedures in denying the plaintiff tenure, such actions could be evidence of discriminatory animus. *See id.* at 434. Here, however, even assuming that Reed is correct that certain procedures were not followed in hiring Sanders, the failure to follow these procedures had no impact upon Reed's termination itself three months earlier. As the court has already stated, the relevant inquiry in performing the pretext analysis is whether race played a role at the moment the employment decision at issue was made. *See Price Waterhouse*, 490 U.S. at 241, 109 S.Ct. 1775. Accordingly, whether or not HP followed its procedures in hiring Sanders three months after Reed's termination is immaterial. Because Reed has otherwise adduced no evidence of discriminatory animus with regard to Sanders' selection, the court finds that his allegations are insufficient to withstand summary judgment.

ers is a minority.

6. Reed does not dispute that, of those interviewed, Sanders was the best qualified.

In his answering brief, Reed also alleges that Sanders had performance problems after he replaced Reed. For the same reason that the procedures followed in selecting Sanders are immaterial, the court finds that Sanders' later alleged performance issues are also immaterial to this motion.

The court thus concludes that Reed has adduced barely a scintilla of the evidence needed to establish his *prima facie* case. Nor has he met his burden of bringing forth evidence that HP's proffered legitimate reason for his termination was pretextual. Accordingly, no reasonable trier of fact could determine that HP terminated Reed because of his race in violation of Title VII.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

In this portion of Reed's claims, he argues that HP breached its duty to him to act in good faith and deal fairly by committing acts of fraud, deceit, and misrepresentation.[7]

■ The Delaware Supreme Court has strictly limited the application of the implied covenant of good faith and fair dealing in the employment context, holding that a plaintiff must establish that he or she falls into one of four exclusive categories. *See Lord v. Souder*, 748 A.2d 393, 401 (Del.2000). The four categories are: (1) where the termination violates public policy and no other remedial scheme exists; (2) where the employer misrepresented an important fact and the employee relied on that fact to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442–44 (Del.Supr. 1996). Irrespective of the category implicated, a claim for the breach of the duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit or misrepresentation. *See Peterson v. Beebe Med. Ctr., Inc.*, 1992 WL 354087, at *5 (Del. Nov. 13, 1992), *aff'd*, 623 A.2d 1142 (Del.1993).

■ In his complaint, Reed argues that HP falsified or manipulated employment records to create a fictitious ground for termination. Reed then argues that HP's reason for his termination was false, and merely a pretext for discrimination. However, "[n]othing in *Pressman* suggests [that] an employer who gives an employee a false reason for termination is subject to liability under the implied covenant of good faith and fair dealing." *Williams v. Caruso*, 966 F.Supp. 287, 291 (D.Del.1997). To the contrary, employers are only culpable for the *manufacture* of grounds for dismissal, not for the statement of a false reason for dismissal.[8] *See id.*

■ Reed has failed to establish any evidence that HP manufactured false evidence against him. Indeed, Reed has pro-

---

7. The court can adjudicate this state law claim by the exercise of its supplemental authority pursuant to 28 U.S.C. § 1367(c) (2001). Thus, the court will retain jurisdiction over this claim, despite having dismissed the Title VII claim over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c).

8. The Delaware Supreme Court has not addressed this issue directly. However, where state law is unsettled, it is appropriate for a District Court to predict how the Delaware Supreme Court would resolve a particular dispute. *See Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 92 (3d Cir.1996).

duced no proof that HP's reasons for his termination were even false. Instead, Reed relies on vague assertions that Kerins "distorted the meanings of documents and events." As apparent proof of this, he asserts that HP did not afford him the opportunity to defend himself against the accusations that he usurped his authority. Whether or not HP provided such an opportunity is immaterial to this motion. Reed admits he acted without authority on numerous occasions. In light of those admissions, there was nothing relevant to this motion that he could have said in his defense. The fact that he admittedly acted without authority gave HP every right to terminate him. Accordingly, the court finds that he has adduced no concrete evidence of HP manufacturing evidence against him. Summary judgment will be granted on this claim.

## V. CONCLUSION

For the foregoing reasons, the court concludes that Agilent is entitled to summary judgment because Reed cannot establish his claims of race discrimination and breach of the implied covenant of good faith and fair dealing as a matter of law.