**Abdel Moniem Ali EL–GANAYNI,**
Appellant

v.

**UNITED STATES DEPARTMENT OF ENERGY; Jeffrey F. Kupfer, Acting Deputy Secretary of Department of Energy.**

No. 08–4745.

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 2009.

Filed: Jan. 11, 2010.

George E. McGrann, Paul H. Titus, Keith E. Whitson (argued), Schnader Harrison Segal & Lewis, Pittsburgh, PA, Witold J. Walczak, American Civil Liberties Union, Pittsburgh, PA, for Appellant.

Thomas M. Bondy, Beth S. Brinkmann (argued), United States Department of Justice, Washington, DC, Marcia Sowles, United States Department of Justice, Civil Division, Washington, DC, for Appellee.

Before: SMITH, FISHER, and STAPLETON, Circuit Judges.

OPINION

SMITH, Circuit Judge.

Dr. Abdel Moniem Ali El–Ganayni was fired from his job at Bettis Laboratory after the Department of Energy ("DOE") revoked his security clearance. El–Ganayni sued the DOE and its Acting Deputy Secretary Jeffrey Kupfer, claiming that the revocation of his clearance violated the United States Constitution and the Administrative Procedure Act ("APA"). The District Court dismissed all of his claims. El–Ganayni appeals. Because we conclude that El–Ganayni's complaint failed to state a claim upon which relief may be granted, we will affirm the judgment of the District Court.

I.

The following statements of fact are drawn from El–Ganayni's complaint. Because the District Court decided this case on a motion to dismiss, the allegations in the complaint "must be accepted as true for purposes of this appeal." *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 579 F.3d 304, 306 n. 1 (3d Cir. 2009).

El–Ganayni is a native-born Egyptian. He came to the United States in 1980 and settled in Pittsburgh, Pennsylvania. He holds a Master's degree in atomic physics and a Ph.D. in nuclear physics. In 1988, he became a United States citizen. In 1990, he was hired as a physicist at Bettis Laboratory, a facility operated under contract with the DOE. Bettis was and remains dedicated solely to the Naval Nuclear Propulsion Program, a joint Navy–DOE program responsible for the design, construction, operation, and maintenance of nuclear-powered warships. El–Ganayni's job required a security clearance, and he received one in May of 1990. That clearance was subject to at least five re-evaluations between 1990 and 2007, and on each occasion El–Ganayni retained his clearance. He never received a negative performance evaluation and was never accused of misconduct.

El–Ganayni is Muslim, and outside of work he was active in various causes related to his faith. He helped to establish one of Pittsburgh's first mosques, the Islamic Center of Pittsburgh (the "Islamic Center"), and served in its leadership. He regularly spoke at services there and at other Pittsburgh-area mosques.

According to El–Ganayni, government scrutiny of Pittsburgh-area Muslims increased after the attacks of September 11, 2001. On June 30, 2006, the FBI raided the Light of Age Mosque, a mosque located on Pittsburgh's North Side, during a solemn prayer service known as Juma'h. Two weeks later, El–Ganayni gave a speech at the Islamic Center criticizing the FBI and condemning the raid. During the same speech, he strongly criticized United States foreign policy. He was especially critical of American involvement in Iraq.

Then, in June or July of 2007, El–Ganayni gave a speech at a mosque to promote prison outreach. While there, he found FBI brochures recruiting Muslim informants. He told the congregation that the FBI's recruitment efforts were improper because the mosque was a house of worship. He argued that the FBI had become a political organization, not a law enforcement agency. He told congregants that they should report crimes if they knew of any, but that they should not serve as informants for the FBI until it stopped acting like a political organization.

Around the same time, El–Ganayni began serving as an Imam for the Pennsylvania Department of Corrections at the State Correctional Institution at Forest ("SCI–Forest"). He requested to speak with the superintendent there about the treatment of Muslim prisoners, but the superintendent declined to meet with him. In July of 2007, he sought to raise money for Eid al-Fitr ceremonies at SCI–Forest for Muslim prisoners who were unable to pay their share of the costs themselves.[1] The superintendent refused to accept any money raised by El–Ganayni. Shortly thereafter, El–Ganayni learned that prison officials were upset with him for distributing to prisoners a book about Islam titled *The Miracle in the Ant.* The book contained a passage about a defense mechanism found in certain ants, which allows them to burst open their body wall and spray deadly secretions upon attackers.

Approximately a week after learning of the displeasure at SCI–Forest over *The Miracle in the Ant,* El–Ganayni drove a Muslim inmate's family four hours to a different state prison so that the inmate and her family could visit. The family had an appointment, but El–Ganayni and the family were denied entry. El–Ganayni complained and asked to speak with the deputy warden and the superintendent. Both requests were denied. El–Ganayni submitted a written complaint over the incident. Several days later, he received a phone call stating that his contract with SCI–Forest was being terminated.

On October 24, 2007, El–Ganayni was called into a meeting with the Bettis Laboratory Security Manager. Another person, unidentified, was present. At the meeting, El–Ganayni was questioned extensively. He was asked whether he supported killing Americans, whether he supported suicide bombings, and whether *The Miracle in the Ant* could be construed as encouraging suicide bombings. He was also questioned about his contacts with other Muslims, his interactions with the Pennsylvania Department of Corrections, his speeches at mosques, and his practice of sending money to a family in Yemen. At the end of the meeting, El–Ganayni was told that his security clearance was suspended pending "resolution of issues." He was escorted from the building.

Several weeks later, El–Ganayni agreed to an interview with the FBI. FBI agents informed El–Ganayni that the DOE had asked the FBI to determine whether he should continue to hold his security clearance. The agents asked him questions similar to those posed by the Bettis Laboratory Security Manager. He was also asked about his views on the Koran; whether he ever watched television or Internet news broadcasts depicting the deaths of Americans in Iraq; whether he was a member of Hamas or al-Qaeda, or whether he knew anyone in those organizations; and whether he believed an Iraqi would be a martyr if he killed an American in a suicide bombing. At the end of the meeting, the FBI advised El–Ganayni that

---

1. Eid al-Fitr is a feast celebrating the end of Ramadan.

more meetings might be necessary, but no more interviews were scheduled.

In December of 2007, El–Ganayni received a letter from a DOE official informing him that he was suspended with pay. The letter stated that "reported information" cast "substantial doubt" on his continued eligibility for a security clearance. The letter further stated that the DOE possessed information indicating that El–Ganayni's continued possession of a security clearance could endanger national security. On December 12, 2007, El–Ganayni was placed on reduced pay for the length of his suspension.

In January of 2008, El–Ganayni received a letter explaining the reasons for the suspension of his security clearance. The letter stated:

> Reliable information in the possession of the Department of Energy indicates that you have knowingly established or continued sympathetic association with a saboteur, spy, terrorist, traitor, seditionist, anarchist, or revolutionist, espionage agent, or representative of a foreign nation whose interests are inimical to the United States, its territories or possessions, or with any person advocating the use of force or violence to overthrow the Government of the United States or any state or subdivision thereof by unconstitutional means.

It further stated that:

> Reliable information in the possession of the Department of Energy indicates that you have engaged in unusual conduct or are subject to circumstances which tend to show that you are not honest, reliable, or trustworthy; or which furnishes reason to believe that you may be subject to pressure, coercion, exploitation, or duress which may cause you to act con-

trary to the best interests of national security. Specifically, the circumstances or conduct involve conflicting allegiances.

These allegations simply tracked the language of DOE regulations, *see* 10 C.F.R. § 710.8(b), *(l)*, and did not include any details about the "reliable information" possessed by the DOE.

The letter also explained certain procedures through which El–Ganayni could challenge the allegations against him. Those procedures included a hearing before a DOE Hearing Officer; the right to submit written answers to the allegations against him; the right to present evidence on his behalf; and the right to be present and to be represented by counsel at his own expense.

El–Ganayni accepted the DOE's offer to challenge the allegations in the January letter, and to that end he requested a hearing. After an initial status conference, however, the DOE terminated the proceedings. On May 19, 2008, Acting Deputy Secretary of Energy Kupfer notified El–Ganayni that his security clearance was revoked (the "Kupfer Certification"). Kupfer certified under Executive Order 12968 that the usual procedures available in security clearance revocation proceedings could not "be made available [to El–Ganayni] ... without damaging the interests of national security by revealing classified information." Kupfer stated that this determination was "conclusive." He did not describe the specific national security concerns that motivated the decision to revoke El–Ganayni's clearance without a hearing. Later, the Kupfer Certification was superseded by a similar certification by Secretary of Energy Samuel W. Bodman (the "Bodman Certification").[2]

2. The Bodman Certification was issued after this lawsuit began, to obviate a legal dispute that arose in the District Court as to whether

Lacking a security clearance, El–Ganayni lost his job at Bettis Laboratory on May 22, 2008.

## II.

On June 26, 2008, El–Ganayni filed this lawsuit in the United States District Court for the Western District of Pennsylvania. His three-count complaint named Kupfer and the DOE as defendants. In Count I, El–Ganayni alleged that the defendants violated his First Amendment rights to free speech and free exercise of religion. He contended that the DOE revoked his clearance in retaliation for the speeches he gave criticizing the FBI, United States foreign policy, and the war in Iraq. In Count II, he alleged that the DOE and Kupfer violated his Fifth Amendment right to equal protection by discriminating against him on the basis of his religion and national origin. According to El–Ganayni, the DOE invoked national security solely to mask its real reasons for revoking his clearance, and that the real reasons were retaliatory, discriminatory, and unconstitutional. In Count III, El–Ganayni alleged that the defendants violated the APA and his Fifth Amendment right to due process by failing to follow DOE regulations in revoking his clearance. He sought a declaration that defendants' actions were unconstitutional and an order requiring the DOE to provide him with a hearing and other procedures provided by DOE regulations. Significantly, he claimed that he did not seek to overturn the security revocation decision. He only sought a hearing and the opportunity to contest the revocation before a neutral arbiter.

The government moved to dismiss Counts I and II for lack of jurisdiction under *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), and Count III for failure to state a claim. It argued that the Executive Branch's revocation of a security clearance is not subject to judicial review and that, in any event, El–Ganayni's clearance was revoked in compliance with DOE regulations. The District Court concluded that Counts I and II required examination of the merits of the DOE's decision to revoke his clearance, and therefore dismissed those claims for lack of jurisdiction. The District Court also concluded that the DOE followed its own regulations and dismissed Count III for failure to state a claim. El–Ganayni appealed.

The District Court exercised jurisdiction under 28 U.S.C. § 1331. Jurisdiction in this court arises under 28 U.S.C. § 1291. We exercise plenary review of the District Court's order granting the government's motion to dismiss. *Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir.2008).

## III.

### A.

■ The government, citing *Egan*, contends that Article III courts lack jurisdiction over this case because they lack jurisdiction to review the merits of a security clearance revocation. Citing *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), and *Stehney v. Perry*, 101 F.3d 925 (3d Cir.1996), El–Ganayni argues that we do have jurisdiction. To decide the jurisdictional question, we must examine all three of these cases in some detail.

The plaintiff in *Egan*, Thomas M. Egan, worked at a naval facility where all employees were required to have security clearances. *Egan*, 484 U.S. at 520, 108 S.Ct. 818. After Egan had worked at the facility for a short time, the Navy denied

Kupfer had authority to revoke El–Ganayni's security clearance.

him a security clearance and removed him from his position. Egan sought review by the federal Merit Systems Protection Board ("the Board").[3] *Id.* at 522, 108 S.Ct. 818. During the ensuing Board proceedings, the Navy contended that the Board "did not have the authority to judge the merits of the underlying security-clearance determination" that led to Egan's removal. *Id.* at 523, 108 S.Ct. 818. It argued that the Board could only inquire as to whether a clearance was a requirement for Egan's position, and whether the required procedures had been followed in removing him. *Id.* The Board agreed that it had no authority to review the merits of a security clearance determination and sustained Egan's removal. *Id.* at 525, 108 S.Ct. 818. On appeal, the Federal Circuit reversed the Board, reasoning that the "absence of any statutory provision precluding appellate review of security clearance denials" in removal proceedings such as the one before it created a strong presumption in favor of review. *Id.* at 526, 108 S.Ct. 818.

The Supreme Court reversed, holding that the Board lacked authority to review the merits of the Navy's decision to revoke Egan's security clearance. *Egan,* 484 U.S. at 526–27, 108 S.Ct. 818. The Court acknowledged the general rule that agency action is presumptively reviewable, but noted that this presumption has its limits, and that it "runs aground when it encounters concerns of national security." *Id.* at 527, 108 S.Ct. 818. It noted that the decision to grant a security clearance is "a sensitive and inherently discretionary judgment call ... committed by law to the appropriate agency of the Executive Branch." *Id.* The "law" to which the Supreme Court referred was the United States Constitution. The Supreme Court explained that:

> "The President, after all, is the 'Commander in Chief of the Army and Navy of the United States.' U.S. Const., Art. II, § 2. His authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant. This Court has recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business. The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief."

*Id.* (citations omitted).

The *Egan* Court also stated that it was "obvious" that "no one has a 'right' to a security clearance." *Id.* at 528, 108 S.Ct. 818. The Court noted that the decision to grant a clearance is discretionary, and must be premised on the judgment that an individual's receipt of a clearance is "clearly consistent with the interests of national security." *Egan,* 484 U.S. at 528, 108 S.Ct. 818. Because such judgments about whom to trust with classified information are made by experts in the Executive branch, and because they implicate the President's traditional authority over "military and national security affairs," *see id.* at 530, 108 S.Ct. 818, the Court reasoned that they are entitled to deference from

---

**3.** "The Merit Systems Protection Board is an independent, quasi-judicial agency in the Executive branch that serves as the guardian of Federal merit systems." *About MPSB,* MSPB. gov, http://www.mspb.gov/sites/mspb/pages/AboutMSPB.aspx (last visited Nov. 30, 2009).

"nonexpert outside bod[ies]" such as the Board. *Id.* at 529, 108 S.Ct. 818.

Although *Egan* held only that a nonexpert agency (the Board) lacked authority to review the merits of a security clearance decision, its holding has since been extended. Many courts, including this one, hold that *Egan* also forbids *judicial* review of the merits of clearance decisions. *See, e.g., Makky v. Chertoff,* 541 F.3d 205, 212 (3d Cir.2008) (citing *Egan* and stating that "there is no judicial review of the merits of a security clearance decision"); *Stehney,* 101 F.3d at 932 (noting the consensus in the Courts of Appeals about the scope of *Egan); Dorfmont v. Brown,* 913 F.2d 1399, 1401 (9th Cir.1990); *Jamil v. Sec'y. of the Dep't of Def.,* 910 F.2d 1203, 1206 (4th Cir.1990); *Hill v. Dep't of the Air Force,* 844 F.2d 1407, 1409 (10th Cir.1988).

*Egan*'s deferential approach may be contrasted with the Supreme Court's holding in *Webster.* There, the Court decided the extent to which the employment decisions of the Director of the Central Intelligence Agency ("CIA") were judicially reviewable. Section 102(c) of the National Security Act of 1947 permitted the Director of the CIA, "in his discretion, [to] terminate the employment of any officer or employee of the Agency" whenever he deemed such termination "necessary or advisable in the interests of the United States." *Webster,* 486 U.S. at 594, 108 S.Ct. 2047. John Doe worked for the CIA for nine years before voluntarily informing a CIA security officer that he was a homosexual. *Id.* at 595, 108 S.Ct. 2047. Ultimately, the Director determined that Doe's homosexuality was a threat to national security and fired him under Section 102(c). *Id.* Doe sued, claiming that the CIA's actions were arbitrary and capricious under the APA. He also asserted a panoply of constitutional claims, including violations of his rights to due process and equal protection under the

Fifth Amendment, and violations of his rights to property, liberty, and privacy under the First, Fourth, Fifth, and Ninth Amendments. *Id.* at 595–96, 108 S.Ct. 2047. The Supreme Court held that Doe could not bring an APA claim, because Section 102(c) granted the CIA Director unreviewable discretion in employment decisions. *Id.* at 599–600, 108 S.Ct. 2047. The Court also held, however, that Section 102(c) did not preclude judicial review of "colorable constitutional claims arising out of the actions of the Director pursuant to that section." *Id.* at 603, 108 S.Ct. 2047. The Court reached this conclusion to "avoid 'the serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster,* 486 U.S. at 603, 108 S.Ct. 2047.

In *Stehney,* this Court sought to reconcile the decisions in *Webster* and *Egan.* The plaintiff in *Stehney* worked at a private "think tank" involved in research for the National Security Agency (the "NSA"). *Stehney,* 101 F.3d at 928. Her job required a security clearance, which she received but later lost when she refused to take a polygraph test. *Id.* at 929. Stehney filed a complaint alleging that the NSA violated her constitutional rights to due process, privacy, and equal protection. She also alleged that the NSA failed to follow its own regulations in revoking her clearance. The District Court dismissed Stehney's constitutional claims for lack of jurisdiction. *Id.* It concluded that the revocation of Stehney's clearance was a nonreviewable political question. *Id.* at 932. According to the District Court, "*Egan* supported the conclusion that there was a 'textually demonstrable constitutional commitment' of the issue of access to classified information to the Executive Branch" under Article II and that any "judicial review [of such] decisions violated the separation of powers." *Id.*

We held that the District Court erred in dismissing Stehney's claims for lack of jurisdiction. We adhered to *Egan*'s holding that the merits of the revocation decision were non-reviewable. *Stehney,* 101 F.3d at 932. We emphasized, however, that "not all claims arising from security clearance revocations violate separation of powers or involve political questions." *Id.* We read *Egan* and *Webster* together as holding that Article III courts have jurisdiction to hear "constitutional claims arising from the clearance revocation process," even though the merits of that revocation cannot be reviewed. *See id.* (citing *Webster,* 486 U.S. at 603–04, 108 S.Ct. 2047).[4] In concluding that Article III jurisdiction existed, we stressed that Stehney was not asking for review of the merits of the NSA's revocation, but instead sought review of the constitutional claims arising from the NSA's decision to revoke her clearance. *Stehney,* 101 F.3d at 932.

This Court drew a similar distinction in *Makky.* In that case, we exercised jurisdiction over a mixed-motive Title VII claim challenging a security clearance revocation. Citing *Stehney,* we emphasized the "distinction between challenging the merits of a clearance revocation and challenging the revocation process," noting our authority over the latter but not the former. *Makky,* 541 F.3d at 212–13. We reviewed the plaintiff's claim on the merits, but were careful to note in doing so that we could not "question the motivation behind the decision to deny Makky's security clearance." *Id.* at 213.

In light of *Egan, Webster, Stehney,* and *Makky,* we conclude that the District Court had jurisdiction over El–Ganayni's allegations that constitutional violations occurred in the process of revoking his security clearance. In Count I, El–Ganayni claims that the decision to suspend and then revoke his security clearance was made in retaliation for the exercise of his First Amendment rights to freedom of speech and religion. In Count II, he asserts that the decisions to suspend and revoke his security clearance were based on his religion and national origin. Read in the light most favorable to El–Ganayni, Counts I and II both assert "constitutional claims arising from the clearance revocation process." *Stehney,* 101 F.3d at 932. Like Stehney, El–Ganayni does not ask us to restore his security clearance. He only seeks review of his claim that an agency violated his constitutional rights in the process of revoking his clearance, and at most, a new hearing concerning that clearance. While we cannot review the merits of the decision to revoke El–Ganayni's security clearance, *Stehney* requires us to exercise jurisdiction over El–Ganayni's constitutional claims and review them to the extent that we can do so without examining the merits of that decision. *See Stehney,* 101 F.3d at 932 (noting that "to the extent that Stehney seeks review of whether NSA ... violated her constitutional rights," she presented a justiciable claim, but emphasizing that there could be no review of the merits of the clearance revocation). *See also Makky,* 541 F.3d at 213 (reviewing plaintiff's Title VII claim but stating that the court was powerless to "question the motivation behind the decision" to deny plaintiff a clearance). Thus, the District Court erred in dismissing Counts I and II for lack of jurisdiction. Nevertheless, we will affirm the dismissal of Counts I and II because they fail to state a claim upon which relief can be granted.

---

4. We also reiterated that Stehney had no "constitutionally protected liberty or property interest in a security clearance or a job requiring a security clearance." *Stehney,* 101 F.3d at 936 (citing *Egan,* 484 U.S. at 528, 108 S.Ct. 818).

## B.

 As noted, Count I is a First Amendment retaliation claim. To state a prima facie case of retaliation, El–Ganayni must show (1) "that his conduct was constitutionally protected" and (2) that "his protected activity was a substantial or motivating factor in the alleged retaliatory action." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir.2002). The DOE may defeat his prima facie case by "showing that it would have taken the same action even in the absence of the protected conduct." *Id.* (quoting *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996)).

El–Ganayni could easily establish that the political and religious speech that allegedly led to the revocation of his clearance was constitutionally protected. It is the second element of his prima facie case that is problematic. Proving that El–Ganayni's political speech was "a substantial or motivating factor" in the decision to revoke his clearance would inevitably require review of the merits of the DOE's decision. There is simply no way to prove or disprove what was-or perhaps more importantly for this case, what was not—a "substantial or motivating factor" in the decision to revoke El—Ganayni's clearance without demanding *some* explanation of that decision from the DOE. It would require discovery of DOE officials and documents concerning the various "factors" that led to the decision to revoke the clearance, and scrutiny of those factors to determine which were "substantial" or "motivating." *Id.* We can discern no difference between that inquiry and the review of the merits that is forbidden by *Egan.* Indeed, El–Ganayni never explains how he could succeed on Count I without reviewing the merits. Just the opposite; he admits that reviewing the merits is exactly what he seeks to do. He claims that the DOE's

invocation of national security was pretextual, and that the real reasons would prove to be violative of his constitutional rights. He argues that:

> [A]lthough a review of the DOE's action may entail an examination of the basis for [its] decisions, it does not follow that the Court must second-guess the DOE's exercise of predictive judgment. The purpose of this lawsuit is to ensure that [the] DOE's actions are indeed based on such predictive judgment and not based on discriminatory animus. If it is determined that [the] DOE's actions ... were constitutionally permissible (not based on constitutionally-prohibited rationale) then no further review ... is necessary.

Appellant's Br. at 29–30. In other words, El–Ganayni argues that the DOE need not tell him *why* it revoked his clearance, but it must tell him that it really did so based on national security and not as a pretext for discrimination. This argument fails. El–Ganayni gives away the game when he concedes that his constitutional claims "may entail an examination of the basis for DOE's decisions." This admission is fatal. An "examination of the basis" of the DOE's decision to revoke El–Ganayni's clearance is precisely what *Egan* forbids. *See Egan,* 484 U.S. at 529–30, 108 S.Ct. 818 (explaining that "an agency head who must bear the responsibility for the protection of classified information ... should have the final say in deciding whether to repose his trust" in a particular person); *Stehney,* 101 F.3d at 932; *Dorfmont,* 913 F.2d at 1401.

The Ninth Circuit rightly rejected an argument similar to El–Ganayni's in *Brazil v. U.S. Dep't of the Navy,* 66 F.3d 193 (9th Cir.1995). In *Brazil,* the plaintiff sued the Navy under Title VII after his security clearance was revoked. He argued that his Title VII claim did "not require the court to determine whether the

Navy's reasons for revoking his clearance were valid; it merely require[d] a determination of whether the proffered reasons were the actual reasons." *Brazil*, 66 F.3d at 197. The Ninth Circuit rejected this attempt to escape *Egan* by claiming pretext, for reasons that are equally applicable here:

> The more valid a reason appears upon evaluation, the less likely a court will be to find that reason pretextual; the converse is also true. Even when the court faces independent evidence of a discriminatory motive, it is still necessary to weigh the validity of the defendant's proffered reasons when deciding if they are pretextual. In short, the merit of such decisions simply cannot be wholly divorced from a determination of whether they are legitimate or pretextual.

*Id.* at 197.

Additionally, we note that even if El–Ganayni could somehow make out the prima facie case for his First Amendment claim, the DOE's right to defend itself against that claim also raises problems under *Egan*. If El–Ganayni made out his prima facie case, DOE could theoretically still prevail by proving that it would have taken the same action even in the absence of El–Ganayni's religious and political speech. *Ambrose*, 303 F.3d at 493. That would inevitably require the DOE to explain in detail its decision to revoke El–Ganayni's clearance, or at least submit an affidavit stating that it did not revoke El–Ganayni's clearance because of his protected speech.[5] But because of *Egan*, no court could ever force the DOE to do so. Furthermore, even if the DOE *chose* to offer a nondiscriminatory explanation for its decision to revoke El–Ganayni's clearance, a factfinder would then have to assess the

plausibility of that explanation to decide whether the government met its "burden" under step three. Weighing the strength of the government's arguments against El–Ganayni's claims of pretext would amount to a judgment on the merits of the decision to revoke El–Ganayni's clearance. This too would violate *Egan*. *See Brazil*, 66 F.3d at 197. For reasons of "institutional competence, separation of powers, and deference to the Executive on national security matters," *Stehney*, 101 F.3d at 932, the decision to deny a security clearance is left to the sole discretion of the Executive branch. The Secretary of Energy, who serves as a trustee of the presidential power over information critical to national security, simply cannot be ordered to justify his decisions in this area, nor can his justifications be subjected to weighing and second-guessing by a "nonexpert outside body" such as a factfinder in a federal court. *Egan*, 484 U.S. at 529, 108 S.Ct. 818.

We conclude that Count I was properly dismissed because El–Ganayni cannot prevail on his First Amendment claim. The legal framework applicable to that claim would demand from the DOE an explanation of its decision to revoke El–Ganayni's clearance, and allow a factfinder to weigh the DOE's arguments in support of that decision. *Egan* forbids both. Put another way, El–Ganayni's claim could never be meaningfully litigated; the outcome is preordained. Whatever else happened, the DOE would always prevail because of *Egan*. In short, we believe that *Egan* presents an "insuperable bar to relief" on Count I. *See Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir.2008) (explaining that dismissal for failure to state a claim is appropriate where an "insuperable

---

**5.** We need not and do not decide what would happen if the Secretary of Energy instead averred that he did, in fact, revoke El–Ganay-

ni's clearance based on some criterion that appeared constitutionally suspect, such as El–Ganayni's religion.

bar to relief" is evident from the face of the complaint); 5B Wright & Miller, *Federal Practice & Procedure* § 1357 (3d ed.2004) (same). Therefore, Count I was properly dismissed because it failed to state a claim upon which relief could be granted. *See Port Authority of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 312 (3d Cir.1999) (stating dismissal under Rule 12(b)(6) is appropriate where "a complaint states a claim based upon a wrong for which there is clearly no remedy, or a claim which the plaintiff is without right or power to assert and for which *no relief could possibly be granted*") (emphasis added).

El–Ganayni's equal protection claim under the Fifth Amendment fails for similar reasons. This court would apply the *McDonnell Douglas–Burdine* burden-shifting framework to that claim. *See, e.g., Rode v. Dellarciprete*, 845 F.2d 1195, 1205 (3d Cir.1988) (applying *McDonnell Douglas* framework to equal protection claim); *Stewart v. Rutgers*, 120 F.3d 426, 431–32 (3d Cir.1997) (applying framework to claim of racial discrimination in employment). Under that framework, to prove that the decision to suspend and revoke his security clearance was based on his religion and national origin, El–Ganayni would have to first establish a prima facie case of discrimination by a preponderance of the evidence. *Stewart*, 120 F.3d at 432. The burden would then shift to the DOE to come forward with a non-discriminatory explanation for its decision. *Id.* Finally, El–Ganayni could offer evidence demonstrating that the DOE's non-discriminatory explanation was a pretext. *Id.*

Count II fails because the legal framework governing that claim, like the framework governing Count I, would inevitably involve scrutiny of the merits of the DOE's decision to revoke El–Ganayni's clearance. Even assuming that El–Ganayni could es-

tablish his prima facie case, neither the second nor third steps could proceed without running headlong into *Egan*. As explained above, neither El–Ganayni nor a court could compel the DOE to offer a "non-discriminatory explanation" for its decision to revoke El–Ganayni's clearance. The DOE cannot be held to a "burden" to justify the decision to revoke El–Ganayni's clearance under the *McDonnell Douglas–Burdine* framework because the DOE has no duty to justify that decision, period. It is beyond judicial review. For similar reasons, El–Ganayni could never establish that the DOE's national security explanation was a pretext for a discriminatory motive. He could never gather the evidence necessary to prove that claim, and even if he could, no fact finder could be permitted to weigh the merits of the DOE's decision to decide whether it was a pretext. *Egan* forbids it. *See Brazil*, 66 F.3d at 197. Thus, as with Count I, *Egan* stands as an "insuperable bar" to relief on Count II, and it must be dismissed for failure to state a claim. *See Benton*, 524 F.3d at 870; *Port Authority of N.Y. & N.J.*, 189 F.3d at 312.

### IV.

In Count III, El–Ganayni alleges due process violations and violations of the APA, both arising from the DOE's alleged failure to follow its own regulations in revoking his clearance. At the outset, we note that there is no dispute as to the court's jurisdiction over the allegations in Count III. The government concedes, as it must, that the APA grants federal courts "the power to review whether an agency followed its own regulations and procedures during the revocation process." *Stehney*, 101 F.3d at 932.

Count III of El–Ganayni's complaint references both the Due Process Clause of the Fifth Amendment and the APA. To the

extent Count III alleged a due process violation, El–Ganayni abandoned that claim at oral argument.[6] All that remains of Count III, then, is El–Ganayni's claim under the APA that the DOE failed to follow its own regulations, 10 C.F.R. §§ 710.1–710.36 (the "Regulations"), and Executive Order 12968 in revoking his clearance. The District Court disagreed, as do we. Because the DOE followed the applicable Regulations and Executive Orders in revoking El–Ganayni's clearance, Count III fails to state a claim and was properly dismissed.

## A.

■ In reviewing the DOE's actions in this case, we note that we owe "great deference" to the DOE's interpretation of Executive Order 12968 because the DOE has been charged with administering that Order. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Similarly, we will "give substantial deference to an agency's interpretation of its own regulations," *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), and must accept the agency's interpretation as "controlling" unless it is "plainly erroneous or inconsistent with the regulation." *Id.; see also Morrison v. Madison Dearborn Capital Partners,* 463 F.3d 312, 315 (3d Cir. 2006).

El–Ganayni argues that the DOE's interpretations of the relevant Executive Orders and Regulations are not entitled to deference because its interpretations raise "serious constitutional concerns." Appellant's Reply Br. at 11. El–Ganayni does

not state which of his constitutional rights would be violated by the Agency's interpretations, but presumably, he is arguing that he has a due process right to review under the Regulations. This argument conflates El–Ganayni's statutory rights under the APA and his constitutional rights. El–Ganayni may have a right under the APA to judicial review of whether the DOE "followed its own regulations and procedures during the revocation process," *Stehney,* 101 F.3d at 932, but he has no due process right to a security clearance. *Id.* at 936. Therefore, even if we were to accept his argument that an agency interpretation that raises "serious constitutional concerns" is not entitled to deference, that rule would not be applicable here.

## B.

■ The Regulations implemented two Executive Orders. The first was Executive Order 10865, titled "Safeguarding Classified Information within Industry." *See* 10 C.F.R. § 710.1(b). Issued in 1960, it describes certain minimum procedures required in clearance revocation proceedings. *See* Exec. Order 10865 §§ 3–5, 25 Fed.Reg. 1583 (Feb. 20, 1960). The Order also preserves the authority of the head of an agency to bypass any procedure otherwise provided under the Order, if he determines that such procedures "cannot be invoked consistently with the national security." Executive Order 10865 § 9. The agency head's determination that the use of such procedures is inconsistent with national security is "conclusive." *Id.*

---

6. In any event, such a claim would be meritless. The "requirements of due process do not apply unless [the plaintiff] can first show that [he] has a cognizable liberty or property interest in his security clearance." *Dorfmont,* 913 F.2d at 1403; *Jamil,* 910 F.2d at 1209 (affirming summary judgment for defendants

on due process claim because no cognizable liberty or property interest was at stake). No one, including El–Ganayni, has a right to a security clearance, and "[w]here there is no right, no process is due under the Constitution." *Dorfmont,* 913 F.2d at 1403.

The second Executive Order implemented by the Regulations was Executive Order 12968. That Order establishes "a uniform Federal personnel security program for employees" under consideration for security clearances. Exec. Order 12968, Preamble, 60 Fed.Reg. 40245 (Aug. 2, 1995). Section 5.2(a) of the Order grants certain procedural rights to individuals who are denied security clearances. Among those are the right to a written explanation of the basis for the denial of a clearance; the right to request certain documents upon which a denial is based; the right to representation, at the individual's own expense, during revocation proceedings; the right to reply in writing to a revocation decision; the right to appeal that decision; and the right to appear personally before the agency and present evidence. *See* Exec. Order 12968 § 5.2(a)(1)-(7). Section 5.2(c) orders agency heads to issue regulations to implement the procedures described in Section 5.2(a). Exec. Order 12968 § 5.2(c). Despite Section 5.2(a)'s provision of what appears to be generous procedural rights, Section 5.2(d) of the Order reserves agency heads' broad power to bypass those procedures. Under Section 5.2(d), "when the head of an agency or principal deputy personally certifies that a procedure set forth in this section cannot be made available in a particular case without damaging the national security interests of the United States ... the particular procedure shall not be made available." Exec. Order 12968 § 5.2(d). A certification under Section 5.2(d), like the comparable certification available under Section 9 of Executive Order 10865, is "conclusive." *Id.* Similarly, Section 5.2(e) clarifies that nothing in Section 5.2(a) limits the authority of the head of an agency to deny or revoke a security clearance "pursuant to any law or other Executive Order," if the agency head determines that the procedures described in Section 5.2(a)

"cannot be invoked in a manner that is consistent with national security." Executive Order 12968 § 5.2(e). If the agency head makes such a determination, that too is "conclusive." *Id.*

As noted, the DOE has implemented Executive Orders 10865 and 12968 through regulations found at 10 C.F.R. § 710 *et seq.* The Regulations provide, *inter alia,* that an individual whose clearance is under review has the right to be represented by a person of his choosing; the right to present evidence on his own behalf; and the right to cross-examine witnesses, where possible. *See* 10 C.F.R. § 710.26(a)-(d). Despite their provision of extensive procedural protections, the Regulations do not purport to alter the Secretary of Energy's authority over security clearances. By their own terms, the Regulations do not limit the Secretary of Energy's "responsibility and powers ... to ... revoke access to restricted data, national security information, or special material" to the extent otherwise permitted by law. 10 C.F.R. § 710.31(c). Thus, as long as the Secretary of Energy has *some* valid source of authority for revoking a clearance, he may do so consistent with the Regulations.

El–Ganayni's clearance was permanently revoked by the Bodman Certification on November 24, 2008. It is undisputed that he did not receive the full procedural protections prescribed by Section 5.2(a) and the Regulations. The Bodman Certification cited Executive Order 10865 § 9 and Executive Order 12968 § 5.2(d) as authority for bypassing those procedures. Secretary Bodman certified:

In accordance with Section 9 of the Executive Order 10865 ... and Section 5.2(d) of Executive Order 12968 ... I certify that the procedures set forth in Section 3, 4, and 5 of Executive Order 10865, in Section 5.2(a) of the Executive

Order 12968, and in the [DOE] regulations at 10 C.F.R. § 710.26–710.30 cannot be made available to Dr. El–Ganayni without damaging the interests of national security by revealing classified information. This certification is conclusive.

The certification also stated that the procedures contemplated by Section 5.2(a) could not be "invoked in a manner ... consistent with national security," pursuant to Section 5.2(e). Finally, the certification revoked El–Ganayni's clearance without further process, also pursuant to Section 5.2(e). Because Section 5.2(e) requires some "other law or Executive Order" to authorize the revocation of a clearance, the Bodman Certification cited 42 U.S.C. § 2165 as authority to terminate "El–Ganayni's access to classified information in the interest of national security."

We conclude that the Bodman Certification properly revoked El–Ganayni's security clearance under Section 5.2(e) of Executive Order 12968. To do so, Secretary Bodman was required to (1) determine that the usual security clearance procedures could not be "invoked in a manner that is consistent with national security" under (2) "any law or other Executive Order" that grants the power to revoke security clearances. Exec. Order 12968 § 5.2(e). The Secretary satisfied both of those requirements here. First, as required by Section 5.2(e), Secretary Bodman determined that El–Ganayni's se-

curity clearance proceedings could not continue without damaging the interests of national security by revealing classified information. That determination was "conclusive." Exec. Order 12968 § 5.2(e). Second, the Secretary cited 42 U.S.C. § 2165 as a "law or other Executive Order" empowering him to revoke El–Ganayni's clearance.[7] El–Ganayni contends that this was invalid, because 42 U.S.C. § 2165 does not pertain to security clearance revocations. Section § 2165(a) does discuss the DOE's authority to revoke security clearances, in that it requires an agency to determine that permitting a *contractor* to have access to Restricted Data "will not endanger the common defense and security." 42 U.S.C. § 2165(a). We need not decide whether Section 2165 was an appropriate authority, however, because in any case Article II of the Constitution is clearly a source of "law" permitting the revocation of El–Ganayni's security clearance. *See Egan*, 484 U.S. at 527, 108 S.Ct. 818 (citing U.S. Const. art. II, § 2). *Egan* makes clear that under the Constitution, the President, and by extension his designees in the Executive branch, have the authority to "control access to information bearing on national security, and to determine whether an individual is sufficiently trustworthy to [merit] ... access to such information[.]" *Id.* This authority exists by virtue of the "constitutional investment of power in the President and exists quite apart from any

---

7. Although the Bodman Certification does not specify, it appears that Secretary Bodman relied upon Section 2165(a). Section 2165(a) provides as follows:

No arrangement shall be made under section 2051 of this title, no contract shall be made or continued in effect under section 2061 of this title, and no license shall be issued under section 2133 or 2134 of this title, unless the person with whom such arrangement is made, the contractor or prospective contractor, or the prospective

licensee agrees in writing not to permit any individual to have access to Restricted Data until the Director of the Office of Personnel Management shall have made an investigation and report to the Commission on the character, associations, and loyalty of such individual, and the Commission shall have determined that permitting such person to have access to Restricted Data will not endanger the common defense and security. 42 U.S.C. § 2165(a) (2006).

explicit congressional grant." *Id.* Regardless of whether Section 2165 empowered Secretary Bodman to revoke El–Ganayni's clearance, Article II clearly did, so the revocation of El–Ganayni's clearance was not inconsistent with Section 5.2(e).

We further conclude that Secretary Bodman properly invoked Section 5.2(d) to bypass the procedures described in Section 5.2(a) and the Regulations. Section 5.2(d) allows the Secretary to suspend a procedure otherwise provided by Executive Order and regulation, by certifying that it "cannot be made available in a particular case without damaging the national security interests of the United States." That certification is conclusive. Exec. Order 12968 § 5.2(d). Certifying that the usual procedures could not be made available due to national security concerns is precisely what Secretary Bodman did in El–Ganayni's case.

El–Ganayni raises two arguments against the Secretary's reliance on Sections 5.2(d) and 5.2(e). First, he argues that the Regulations supersede Executive Order 12968, and in particular, the authority described in Sections 5.2(d) and (e). According to El–Ganayni, the Regulations were the DOE's official interpretation and implementation of Executive Order 12968, and they contain nothing implementing Section 5.2(d) and (e). Therefore, he contends, Sections 5.2(d) and (e) have been supplanted by the Regulations and are no

longer effective. El–Ganayni argues that if the Secretary of Energy wanted to preserve his broad powers under Sections 5.2(d) and (e), he should have explicitly incorporated those powers into the Regulations.

El–Ganayni's argument is not persuasive. Nothing in the language of the Regulations suggests that they superseded anything in Executive Order 12968.[8] To the contrary, the Regulations state that "[n]othing in these procedures shall be deemed to limit or affect the responsibility and powers of the Secretary ... to deny or revoke access to Restricted Data [or] national security information" under any other law or Executive Order. 10 C.F.R. § 710.31(c). Even though the Regulations did not explicitly incorporate the language of Section 5.2(d) or (e), they did not purport to supersede those provisions either. The Regulations explicitly left undisturbed the Secretary's preexisting authority over clearances, including his authority to revoke those clearances under Section 5.2(d) and (e) where required by national security.[9] In short, nothing in the Regulations precludes the Secretary from invoking Sections 5.2(d) and (e), so Secretary Bodman's reliance on those provisions in revoking El–Ganayni's clearance did not violate the Regulations or the APA.

Second, El–Ganayni argues that the Bodman Certification improperly bypassed

---

8. Nor does anything in the Regulations suggest that they were intended to affect the Secretary's powers under Executive Order 10865.

9. The Executive Order is a delegation of inherently executive authority by the President to another member of the Executive Branch. *See* 3 U.S.C. § 301 (authorizing the President to delegate executive functions to the head of agencies). An agency head is bound by the terms of that delegation. *See Myers v. United States*, 272 U.S. 52, 132–34, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (noting that agency

heads are subject to Presidential control in execution of delegated authority and can be removed for failure to follow Presidential orders). The Order, by its own terms, is "effective immediately" as of its issuance. Exec. Order 12968, § 7.2(f). The delegation of executive authority to the Secretary, including the authority to revoke security clearances under Section 5.2(d) and (e), was therefore immediately effective irrespective of the promulgation of the implementing regulations.

all of the Section 5.2(a) procedures, in violation of the plain language of Section 5.2(d). He notes that Section 5.2(d) refers to the Secretary's authority to deny "a procedure" set forth in Section 5.2(a), upon a finding that "the particular procedure" cannot be utilized without damaging national security. According to El–Ganayni, the references in Section 5.2(d) to individual procedures means that Section 5.2(d) cannot be used, as it was in the Bodman Certification, to effect a blanket denial of all of the Section 5.2(a) procedures. He contends that Section 5.2(d) requires the DOE to certify that each particular procedure under Section 5.2(a) cannot be made available, and explain that conclusion to the hearing officer. We disagree. Under Section 5.2(d), the Secretary need only state that a "procedure set forth in this section" cannot be made available. As the District Court correctly noted, this certification does not require any particular degree of specificity. Here, Secretary Bodman certified that the procedures set forth in Executive Order 10865, Section 5.2(a) of Executive Order 12968, and the regulations at 10 C.F.R. § 710.26—710.30 could not be made available to El–Ganayni in a manner consistent with national security. While Bodman did not list each and every procedure available under each of those provisions, we are satisfied that his identification of the procedures that could not be used was sufficient to satisfy Section 5.2(d). Essentially, the Secretary construed a singular term in Section 5.2(d)—"the particular procedure"—as also encompassing the plural, *i.e.,* all of the procedures enumerated in Section 5.2(a). We cannot say that this interpretation of Section 5.2(d) was "plainly erroneous." *See Udall,* 380 U.S. at 17–18, 85 S.Ct. 792.

Accepting as true all of the factual allegations in El–Ganayni's complaint, we conclude that his security clearance was revoked in accordance with Executive Order 12968 and DOE regulations. Therefore, Count III fails to state a claim under the APA, and was properly dismissed by the District Court.

## V.

For the foregoing reasons, we will affirm the judgment of the District Court.